## UNITED STATES *v.* READING COMPANY.

## TEMPLE IRON COMPANY *v.* UNITED STATES.

## READING COMPANY *v.* UNITED STATES.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

Nos. 198, 206, 217. Argued October 10, 11, 1911.—Decided December 16, 1912.

The United States filed a bill to enforce the provisions of the Sherman Anti-trust Act of July 2, 1890, against an alleged combination of railroad and coal mining companies formed to restrain competition in the production, sale and transportation in interstate commerce of anthracite coal. The bill alleged a general combination through an agreement between the carrier defendants to apportion the coal tonnage between themselves on a scale of percentages; a combination through the medium of one of the mining companies to prevent the construction of a new competing coal carrying road from the anthracite district to tide-water; a combination by a series of identical contracts with independent coal operators for sale of their total product; and certain contributory combinations between some but not all of the defendants. The bill was filed prior to the enactment

of the Commodities Clause of the Hepburn Act of June 29, 1906.
*Held* that:

Any relief against a continuance of the transportation of carrier owned
coal under the Commodities Clause must be sought in a proceeding
based upon that act and cannot be obtained in this suit.

On the record in this case, this court agrees with the court below that
the Government has failed to show any contract or combination for
the distribution of coal tonnage between the carriers.

The defendants did combine to unreasonably restrain interstate com-
merce in violation of the Sherman Anti-trust Act through the
Temple Iron Company to prevent the construction of the competing
coal carrying railroad.

Although a combination has succeeded in accomplishing one of the
purposes for which it was formed, if it is still an efficient agency to
prevent competition in other methods, the court may proceed to
judgment and decree its dissolution.

A disclaimer on the part of defendants of power of any one of them to
control business of the others cannot detract from the significance
of documentary evidence bearing on the relations of the defendants
to each other.

Although separate acts of the defendants may be legal under the state
law when considered alone, they may, when taken together, become
parts of an illegal combination under the Anti-trust Act which it is
the duty of the court to dissolve.

Acts absolutely lawful may be steps in a criminal plot. *Aikens* v.
*Wisconsin,* 195 U. S. 206.

While no one of a number of contracts considered severally may be in
restraint of trade, each of a series of innocent contracts may be a
step in a concerted criminal plot to restrain interstate trade, and,
if so, may thereupon become unlawful under the Anti-trust Act.
*Swift & Co.* v. *United States,* 196 U. S. 375.

In this case *held* that a series of identical contracts between interstate
carriers with a great majority of the independent coal operators to
market all the coal of the latter for all time at an agreed percentage
of tide-water price were all parts of a concerted scheme to control the
sale of the independent output and were unreasonable contracts in re-
straint of interstate trade within the prohibition of the Sherman Act.

Where, as in this case, purchase and delivery within a State is but one
step in a plan and purpose to control and dominate trade and com-
merce in other States for an illegal purpose, it is an interference with
and restraint of interstate commerce. *Loewe* v. *Lawlor,* 208 U. S. 274.

While the Sherman Act does not forbid or restrain the power to make

usual and normal contracts to further trade through normal methods, whether by agreement or otherwise, *Standard Oil Co.* v. *United States*, 221 U. S. 1, it does forbid contracts entered into according to a concerted scheme, as in this case, to unduly suppress competition and restrain freedom of commerce among the States.

While the law may not compel competition, it may remove illegal barriers resulting from illegal agreements, such as those involved in this case, which make competition impracticable.

Whether a particular act or agreement is reasonable and normal or unreasonable may in doubtful cases turn upon intent, and the extent of control obtained over the output of a commodity may afford evidence of the intent to suppress competition.

Where there is no doubt that the necessary result of an act is to materially restrain trade between the States, intent is of no consequence.

In a suit to restrain all defendants from carrying out an illegal combination under the Sherman Act in which all defendants participated, the court will not consider minor combinations between less than all of the defendants which did not constitute part of the general combination found to be illegal. To do so would condemn the bill for misjoinder and multifariousness.

In this case the court expresses no opinion on such minor combinations and as to them the bill should be dismissed without prejudice.

183 Fed. Rep. 427, affirmed in part and reversed in part.

THE facts, which involve the legality under the Sherman Anti-trust Act of certain combinations of railroad and coal mining companies engaged in the production, sale and transportation in interstate commerce of anthracite coal, are stated in the opinion.

*Mr. J. C. McReynolds*, with whom *The Attorney General* and *Mr. G. Carroll Todd* were on the brief, for the United States:

The interests of defendant railroads in the shares of coal owning and producing companies and in anthracite coal lands acquired since January 1, 1874, are held in violation of the constitution of Pennsylvania.

Constitution of Pennsylvania, adopted November 3, 1873, effective January 1, 1874, Art. XVII, § 5; *Int. Com.*

*Comm.* v. *Phila. & Reading Ry. Co.,* 123 Fed. Rep. 969; *Lehigh Valley R. Co.* v. *Rainey,* 112 Fed. Rep. 487; *Stockton* v. *Central R. R. of N. J.,* 50 N. J. Eq. 52; *Farmers' Loan & Trust Co.* v. *New York &c. R. Co.,* 150 N. Y. 410, 430; *York &c. R. Co.* v. *Winans,* 17 How. 31, 40. *Commodities Clause Case,* 213 U. S. 366, is not in conflict with the view that a railroad owning substantially the entire capital stock of a coal mining company is "directly or indirectly" engaged in mining within the meaning of the Pennsylvania constitution.

Where a coal company is run as a department of the railroad, the latter has an "interest, direct or indirect," in the mining, even within the restricted sense of those words in the commodities clause.    *United States* v. *Lehigh Valley R. Co.,* 220 U. S. 257.

Conceding that prior to January 1, 1874, the legislature of Pennsylvania had authorized railroads, either in their own names or indirectly through holding the stock of and controlling coal mining companies, to engage in mining coal for transportation over their own lines, it was yet within the power of the people of that State to provide in their new constitution, all existing laws and charters to the contrary notwithstanding, that no railroad not then so engaged in mining coal should thereafter be permitted to do so; that the authority once granted, whether by general or special law, in so far as it remained unexecuted, was then and there repealed. *Pearsall* v. *Great Northern Ry. Co.,* 161 U. S. 646; *Louisville & Nashville R. Co.* v. *Kentucky,* 161 U. S. 677.

All rights and privileges granted to corporations in Pennsylvania since 1857 were taken expressly subject to revocation, excepting in so far as they might become executed. Pennsylvania constitution of 1790, as amended in 1857, Art. I, § 26; 1 Brightly's Purdon's Dig. Pa. L., 10th ed., p. 24; *Pennsylvania Railroad* v. *Duncan,* 111 Pa. St. 352, 361; *Hays* v. *Commonwealth,* 82 Pa. St. 518.

As to the limitation upon the right to alter or revoke expressed in the clause, "in such manner, however, that no injustice shall be done to the corporators," see *Bienville Water Co.* v. *Mobile*, 186 U. S. 212, 222.

It makes no difference whether the shares of a mining company are purchased at a judicial sale rather than a private sale, since the constitution makes no distinction between the two modes. *Louisville & Nashville R. Co.* v. *Kentucky*, 161 U. S. 677, 692.

It could not obtain by transfer from its predecessor the latter's right (if any it had) to hold the stock of coal mining companies in Pennsylvania if the constitution or laws of Pennsylvania then prohibited such stockholding by a railroad. *Atlantic & G. Ry. Co.* v. *Georgia*, 98 U. S. 359; *St. Louis, I. M. & S. R. Co.* v. *Berry*, 113 U. S. 465; *Keokuk &c. R. Co.* v. *Missouri*, 152 U. S. 301, 308–310; *Mercantile Bank* v. *Tennessee*, 161 U. S. 161, 171; *Yazoo & M. V. R. Co.* v. *Adams*, 180 U. S. 1, 18–21; *Yazoo & M. V. R. Co.* v. *Vicksburg*, 209 U. S. 358, 362.

It is enough that the railroad acquired the shares after January 1, 1874.

No corporation can receive, by transfer from another, an exemption from taxation or governmental regulation which is inconsistent with its own charter or with the constitution or laws of the State then applicable; and this is true, even though, under legislative authority, the exemption is transferred by words which clearly include it. *Rochester R. Co.* v. *Rochester*, 205 U. S. 236, 254; *Yazoo & M. V. R. Co.* v. *Vicksburg*, 209 U. S. 358; *Great Northern Ry. Co.* v. *Minnesota*, 216 U. S. 206.

*Commonwealth* v. *New York, L. E. & W. R. Co.*, 132 Pa. St. 591, distinguished.

Where a railroad lawfully engaged prior to January 1, 1874, in mining coal, either in its own name or through a subsidiary company, has since that date, in its own name or through a subsidiary company, acquired and mined

additional coal lands and so become further engaged in mining, such lands are held in violation of the Pennsylvania constitution.

Railroads engaged, as defendants are, in transporting coals of the same kind from a sole and restricted area of production to the principal market, are competitive, although their tracks may not reach the same mines.

Whether railroads are competitive is a question of mixed law and fact. *State* v. *Vanderbilt*, 37 Oh. St. 590; *United States* v. *Union Pacific R. Co.,* 188 Fed. Rep. 102, 113; *Kimball* v. *Atchison &c. R. R.,* 46 Fed. Rep. 888, 890.

*Mr. John G. Johnson* and *Mr. Adelbert Moot,* with whom *Mr. Charles Heebner, Mr. Frank H. Platt, Mr. Robert W. De Forest, Mr. Jackson E. Reynolds, Mr. George F. Brownell* and *Mr. William S. Jenney* were on the brief, for certain railroad corporations, appellants in No. 217 and appellees in No. 198:

The general charge of the petition, that since 1896 the original defendant railroad companies and coal companies have combined and conspired to stifle competition in and monopolize trade and commerce among the States in anthracite coal, was not sustained by the Government, and that charge was properly dismissed by the unanimous decision of the Circuit Judges.

The testimony offered by the Government, relating to the Board of Control agreement of 1876, the meetings of certain railroad officers from 1884 to 1887, and the leases in 1892 of the Lehigh Valley and Jersey Central railroads to the Philadelphia & Reading Railroad Company, did not constitute legal evidence of the general conspiracy alleged to have existed from 1896 to 1907, nor of any of the five particular conspiracies alleged to have been entered into in furtherance of such general conspiracy.

The claim of the Government that about 1896 an agreement was entered into for a division of the coal tonnage,—

the so-called "Presidents' Percentages,"—and that such percentage agreement was continuously maintained thereafter, was not sustained by the evidence.

The acquisition in 1898 by the Erie Railroad Company of the capital stock of the New York, Susquehanna & Western Railroad Compay constituted no evidence that the defendant railroad and coal companies were in the alleged general conspiracy to stifle competition in trade and commerce in anthracite coal.

The acquisition in 1899 of the Simpson and Watkins collieries by The Temple Iron Company, in which some of the defendants were interested, constituted no evidence that the defendants were engaged in the alleged general conspiracy.

The acquisition in 1901 by the Erie Railroad Company of the capital stock of the Pennsylvania Coal Company furnished no evidence of the alleged general conspiracy.

The acquisition in 1901 by the Reading Company of a majority of the capital stock of the Central Railroad Company of New Jersey furnished no evidence that the defendants were engaged in the general conspiracy alleged.

It was no proof of the alleged general conspiracy, that certain of the defendant railroads purchased minor interests in the capital stock of the Lehigh Valley Railroad Company, and afterwards sold the same at a profit.

It was no proof of the general conspiracy alleged, that in 1905 the Lehigh Valley Railroad Company purchased the interests of Coxe Brothers & Company in a branch line of railroad and in certain coal mining properties on such branch line.

The acquisition of coal lands from time to time by the defendants constituted no evidence of the general conspiracy alleged.

There was no evidence of an agreement or conspiracy to establish or to maintain uniform sales prices or uniform transportation rates.

As to the 65% contracts, the only issue presented by the pleadings is whether they were entered into in pursuance of an agreement or conspiracy between the original defendants to restrain interstate commerce.

The history of these contracts should satisfy this court, as it did the majority of the Circuit Judges, that these contracts did not arise from any desire to terminate a trade war or other competitive conditions, that they were not framed either as the result of any combination or with any object or intent to stifle or obstruct either the production or sale of coal, that they have not had the effect of restricting commerce in coal, and that, on the contrary, they were framed with honest purposes, to establish fair methods of conducting business and that they have resulted in the promotion and increase of commerce.

The 65% contracts are not, in themselves, unlawful and unreasonable restraints of interstate trade and commerce. Those contracts are intrastate, and not interstate contracts; they do not affect interstate commerce, except indirectly and incidentally, and so are not violative of the Anti-trust Act.

*Mr. James H. Torrey* for certain coal mining corporations, appellants in No. 217 and appellees in No. 198:

The 65% contracts do not concern directly interstate commerce and are, therefore, not cognizable in this proceeding.

The position taken by the Government requires as prerequisite of a decree for the cancellation of the 65% contracts, the association in purpose or intention of these defendants with the conspiracy or combination in restraint of trade, which it is charged rendered those contracts illegal. No such association is established either by the pleadings or proof.

So far as concerns these defendants, the 65% contracts are perfectly honest, straightforward and legitimate sales

of coal, untainted by any ulterior or illegal purpose or design.

. As to both contracting parties, sellers and buyers, the 65% contracts are *bona fide* transactions for the sale of the product of the particular collieries involved, untainted by any ulterior or illegal purpose or design.

*Mr. James H. Torrey* and *Mr. William S. Opdyke* filed a brief for appellee, The Delaware & Hudson Company:

The Delaware & Hudson Company has never been a party to any combination for the establishment of a monopoly or for the restraint of interstate commerce, in respect of the production, sale or transportation of anthracite coal.

The contracts made by the Delaware & Hudson Company with the Hillside Coal & Iron Company for the sale of anthracite coal in limited amounts and in limited periods to the Hillside Coal and Iron Company, violated no law of the United States.

These contracts for the sale of coal in the State of Pennsylvania, and all deliveries under such contracts were made in the State of Pennsylvania. They were therefore purely intrastate contracts, both made and performed within the State of Pennsylvania. They did not directly relate in any way to interstate commerce. *Coe* v. *Errol*, 116 U. S. 517; *The Daniel Ball*, 10 Wall. 557, 565; *Kidd* v. *Pearson*, 128 U. S. 1, 24; *United States* v. *Knight*, 156 U. S. 1, 13; *Hopkins* v. *United States*, 171 U. S. 578, 592, 593, 598, 603; *Anderson* v. *United States*, 171 U. S. 604; *Addyston Pipe Case*, 175 U. S. 211, 247; *Field* v. *Barber Asphalt Co.*, 194 U. S. 618, 623; *Bigelow* v. *Calumet & Hecla Co.*, 167 Fed. Rep. 721.

The United States is not entitled to ask for the entry of any decree, by way of injunction or otherwise, against The Delaware and Hudson Company.

The present proceeding is under a statute of a penal

character requiring the strictest proof. *Northern Securities Case*, 193 U. S. 197, 401.

, The absolute freedom of this defendant to make contracts for a sale of a portion, or even of all, its production of anthracite coal to anyone or in any form it sees fit, is one which cannot be taken away from it by any statute. of a State or of the United States.

In the absence of any proof that such sale was upon the part of The Delaware and Hudson Company a portion of an illegal combination to which it was itself in-tentionally a party, the company is entitled to enforce such contract against the other party thereto, and that right cannot be taken away from it without its consent, no question of police power being involved. *Tracy* v. *Talmage*, 14 N. Y. 162, 167; *Ganson* v. *Tifft*, 71 N. Y. 48, 57; *Graves* v. *Johnson*, 179 Massachusetts, 53; *National Distilling Co.* v. *Cream City Importing Co.*, 86 Wisconsin, 356; *Metcalf* v. *American School Furniture Co.*, 122 Fed. Rep. 115, 120; *Carter-Crume Co.* v. *Peurrung*, 86 Fed. Rep. 439, 442; *Adams* v. *Coulliard*, 102 Massachusetts, 167; *Connolly* v. *Sewer Pipe Co.*, 184 U. S. 540.

*Mr. William W. Green*, filed a brief for appellee, The Mercantile Trust Company.

*Mr. Adelbert Moot* and *Mr. George F. Brownell* filed a brief for the Erie Railroad Company, appellee:

The United States failed to show that the Erie Railroad Company, or the stockholders of the New York, Susquehanna & Western Railroad Company, or the stockholders of the Pennsylvania Coal Company, or any other person or corporation, intended "restraint of trade or commerce," or to "monopolize or attempt to monopolize any part of trade or commerce," and therefore the court below unanimously and properly dismissed the petition upon the merits upon the facts.

The defendants' evidence and exhibits affirmatively disprove the charge of either general or special conspiracies to violate either §§ 1 or 2 of the act, and show, instead, that each purchase of stock in question was made by the Erie Railroad Company for proper and lawful business reasons under authority of its charter and the legislation of the States of New York, Pennsylvania and New Jersey, respectively.

The full constitutional and exclusive power of the National Government by executive officers, legislative acts and judicial decrees to regulate interstate commerce is admitted. This does not make the purchase of those stocks interstate commerce or illegal under the Sherman Anti-trust Act, because: The New York, Susquehanna & Western Railroad Company was never a parallel and competing line of the Erie Railroad Company, nor was it in such financial or physical position to compete at the mines or elsewhere, as to enable the Erie Railroad Company to cause restraint or monopoly of interstate trade contrary to such statute.

The Erie Railroad Company, the Pennsylvania Coal Company, and its railroad, the Erie and Wyoming Railroad, had been duly authorized to enter into contract and traffic relations with each other. They had done so; such contracts were not prohibited by Federal law, nor are they now, and such contract relations, begun over 40 years before the stock purchase, still existed, and would continue until at least January 1, 1911; therefore, the acquisition of the stock of such companies by the Erie Railroad Company, to give it further control over a connecting railway in Pennsylvania that was an old and natural connection and feeder, and of the tonnage it was built to serve, more than forty years before, the stock purchase, for the same purpose was lawful. Bosman, 5 R. 1014 R.; Thomas, 5 R. 1121–2; *R. R. Co.* v. *R. R. Co.*, 171 Pa. St. 284; *A. F. &c. R. R. Co.* v. *Denver &c. R. Co.*, 110 U. S. 667; *Cin. R. R.*

*Co.* v. *Int. Com. Comm.*, 162 U. S. 184, 197; *L. & N. R. Co.* v. *West Coast N. S. R. Co.*, 198 U. S. 483; *So. Pac.* v. *Int. Com. Comm.*, 200 U. S. 536–554.

The petition, as we have heretofore pointed out, does not allege that the Pennsylvania Coal Company stock purchase was a "step" in the general conspiracy charged, as it does in other cases; nor does it allege any vice in the purchase, except that the stock was purchased at an "exorbitant" price, and thereby a proposed railroad wholly in the State of New York lost its most influential backer and was never built.

No relief was asked for under this petition, which failed to even state a case within the statute. The Government evidence wholly failed to establish an "exorbitant" price; but the contrary was the undisputed fact. No interstate, or parallel, or competing, railroad was involved, but only a Pennsylvania connection which had been a feeder of over forty years' standing and its tonnage. There was no intent to violate the law, and it was not violated.

*Mr. Everett Warren* for **Temple Iron Company**, appellant in No. 206:

The Temple transactions were not for the purpose of preventing the construction of another interstate carrier of anthracite, even if it is assumed that the independents by securing the charter of the New York, Wyoming & Western contemplated reaching tide-water by the utilization of that proposed road as a means, but were for the purpose of retaining to the carriers the tonnage of the so-called Simpson & Watkins collieries they then enjoyed under lawful contracts, beyond any hazard of a threatened, or supposedly threatened diversion. In other words, it was a measure of defense, not offense, the purposes and intent of which was to fortify and make sure an already impregnable legal position.

The projected road was an intrastate road and nothing else, and if it is assumed that the contemplated purchase of the Simpson & Watkins collieries defeated its construction, and the proofs show the contrary, the purchase did not have any effect upon interstate trade or commerce.

Simpson & Watkins were not the principal supporters of the projected intrastate road. The road itself was a visionary enterprise entirely impracticable and its abandonment was due to other causes than the acquisition by The Temple Iron Company of the Simpson & Watkins collieries.

The charges in the Government's petition, namely, the high price paid for the Simpson & Watkins properties and the little value standing alone of the stock and bonds of The Temple Company, were without foundation of fact to rest upon and were disproven in the Government's own case.

There never was contemplated any pooling or division of the tonnages moving from the Simpson & Watkins collieries among the railroad stockholders of The Temple Company serving the region where these collieries were situated, much less any pooling and division of such tonnage as a fact.

The history of the management and development of the Temple anthracite operation since February, 1899, as it is undisputed and appears in the Government's own case, discloses a careful, business-like conduct of its affairs in line with and following out the plain purpose of its entrance into the anthracite field, namely, to make money out of its mines for its stockholders as independent coal operators. Its transactions are altogether within the State of Pennsylvania and end there.

The Temple transaction had and could have no bearing upon interstate trade or commerce under the actual situation of affairs; are not within the provisions of the Anti-

trust law, nor indeed within the constitutional authority of Congress.

MR. JUSTICE LURTON delivered the opinion of the court.

This is a petition in equity filed by the United States in the Circuit Court of the United States for the Eastern District of Pennsylvania, for the purpose of enforcing the provisions of the act of July 2, 1890, known as the Sherman Anti-trust Act, against an alleged combination of railroad and coal mining companies formed and continued for the purpose of restraining competition in the production, sale and transportation of anthracite coal in commerce among the States.

The defendants originally made such, and alone referred to hereafter as the defendants, were the following:

The Philadelphia & Reading Railway Company; The Philadelphia & Reading Coal and Iron Company; The Lehigh Valley Railroad Company; The Lehigh Valley Coal Company; The Delaware, Lackawanna & Western Railroad Company; The Central Railroad Company of New Jersey; The Erie Railroad Company; The New York, Susquehanna & Western Railroad Company; The New York, Susquehanna & Western Coal Company; The Lehigh & Wilkes-Barre Coal Company; The Pennsylvania Coal Company; The Hillside Coal Company; The Reading Company and the Temple Iron Company. By an amendment certain other defendants were brought in, consisting of holders of contracts made by independent operators of coal mines, and trustees holding securities which might be affected by the relief sought against the carrier and coal mining companies, the original defendants. A list of these later defendants is set out in the margin,[1] and when they are referred to herein they will be specifically mentioned.

---

[1] The Delaware & Hudson Company; Elk Hill Coal & Iron Company; St. Clair Coal Company; Enterprise Coal Company; Buck Run

The bill alleges that anthracite coal is an article of prime necessity as a fuel and finds its market mainly in the New England and Middle Atlantic States. The deposits of the coal, with unimportant exceptions, lie in the State of Pennsylvania, but do not occupy a continuous field, though found in certain counties adjoining in the eastern half of the State, and embrace an area of 484 square miles. This coal region is from one hundred and fifty to two hundred and fifty miles from tide-water. The region itself is broken and mountainous, and the natural conditions and character of the deposits are such that the mining and reduction of the coal to suitable sizes for domestic use require very large amounts of capital. Its value commercially is dependent, in a large degree, upon quick and cheap transportation to convenient shipping points at tide-water, from whence it may be distributed to the great consuming markets of the Atlantic Coast States.

The whole problem of advantageously developing these deposits and supplying the eastern demand for fuel was one which presented enormous difficulties. From an early day it has been the settled policy of the State of Penn-

Coal Company; Llewellyn Mining Company; Clear Spring Coal Company; Pancoast Coal Company; Price-Pancoast Coal Company; Mount Lookout Coal Company; Peoples Coal Company; George F. Lee Coal Company; North End Coal Company; Melville Coal Company; Parrish Coal Company; Red Ash Coal Company; Raub Coal Company; Mid Valley Coal Company; Austin Coal Company; Clarence Coal Company; Nay Aug Coal Company; Green Ridge Coal Company; Excelsior Coal Company; Lackawanna Coal Company; Dolph Coal Company, Limited; Mary F. W. Howe, Frank Pardee, and Sarah Drexel Van Rensellaer, constituting A. Pardee & Co.; Lafayette Lentz, William O. Lentz and Lewis A. Riley, constituting Lentz & Company; William Law and John M. Robertson, constituting Robertson & Law; Richard White, W. R. McTurk and Robert White, constituting E. White Company; Joseph J. Jermyn, George B. Jermyn, Emma J. Jermyn, constituting John Jermyn Estate; Joseph J. Jermyn, Michael F. Dolphin; The Pennsylvania Company for Insurance on Lives and Granting Annuities; and the Mercantile Trust Company.

sylvania to encourage the development of this coal region by canal and railroad construction, which would furnish transportation to convenient shipping points at tidewater. One of the defendant carriers, the Delaware, Lackawanna & Western Company, was given the power to acquire coal lands and engage in the business of mining and selling coal in addition to the business of a common carrier, and all railroad companies were permitted to aid in the production of coal by assisting coal mining companies through the purchase of capital stock and bonds. Thus, it has come about that the defendant carriers not only dominate the transportation of coal from this anthracite region to the great distributing ports at New York harbor, but also through their controlled coal-producing companies, produce and sell about seventy-five per cent. of the annual supply of anthracite. As a further direct consequence of the state authorized alliance between coal-producing and coal-transporting companies, it has come about that the defendant carrier companies and the coal-mining companies affiliated with the carrier companies now own or control about ninety per cent. of the entire unmined area of anthracite, distributed, according to the averments of the petition, as follows:

| | |
|---|---|
| Reading Company | 44. % |
| Lehigh Valley Company | 16.87% |
| Del., Lack. & Western Company | 6.55% |
| Central Railroad of New Jersey | 19. % |
| Erie Railroad | 2.59% |
| N. Y., Sus. & Western Railroad | .54% |
| | 89.55% |

It further appears that in addition to the great coal-mining companies subsidiary to one or another of the defendant carrier companies, there are a large number of independent coal operators whose aggregate production

from coal lands, in part leased from the railroad compan-ies or the railroad-controlled coal-producing companies, amounts to about twenty per cent. of the annual an-thracite supply. These independent operators are said to no longer have the power to compete with the carrier defendants and their subsidiary coal companies, because a large proportion of them have severally entered into contracts with one or the other of the carrier or coal-mining companies defendant for the sale of the entire product of their mines for the consideration of sixty-five per cent. of the average market price at tide-water.

Thus, there exists, independently of any agreement, combination or contract between the several defendant carrier companies for the purpose of suppressing com-petition among them, this condition:

First: Excluding two carrier companies not made de-fendants which reach but a limited number of collieries, the Pennsylvania Railroad Company and the New York, Ontario & Western Railroad Company, the six carrier companies who are defendants are shown to control the only means of transportation between this great anthracite deposit and tide-water from whence the product may be distributed by rail and water to the great consuming markets of the Atlantic Coast States.

Second: These carriers and their subsidiary coal-mining and selling companies produce and sell about seventy-five per cent. of the total annual supply of anthracite coal. Of the remainder, the independent operators mentioned above produce about twenty per cent.

The chief significance of the fact that the six carrier defendants control substantially the only means for the transportation of coal from the mines to distributing points at tide-water is in the fact that they, collectively, also control nearly three-fourths of the annual supply of anthracite which there finds a market. The situation is therefore one which invites concerted action and makes ex-

ceedingly easy the accomplishment of any purpose to dominate the supply and control the prices at seaboard. The one-fourth of the total annual supply which comes from independent operators in the same region has been sold in competition with the larger supply of the defendants. If, by concert of action, that source of competition be removed, the monopoly which the defendants, acting together, may exert over production and sale will be complete.

This bill avers that the defendants have combined for the purpose of securing their collective grip upon the anthracite coal supply by exerting their activities to shut out from the district any new line of transportation from the mines to tide-water points, and to shut out from competition at tide-water the coal of independent operators with their own coal. The steps said to have been taken having this end in view, we shall now consider:

The community of interest which has resulted from the charter powers of the carrier companies to directly or indirectly engage in the business of mining and selling coal has produced the relation between the carrier and coal-mining defendants shown by the several groups into which we have arranged them, thus:

1. The Reading Company is a Pennsylvania corporation, and apparently nothing more than a holding company. That company holds:

a. The entire capital stock of the Philadelphia & Reading Railway, one of the defendant carriers.

b. The entire capital stock of the Philadelphia & Reading Coal & Iron Company, a coal-mining company.

The three companies have the same president.

2. The Lehigh Valley Railroad Company owns all of the capital stock of the Lehigh Valley Coal Company, and the two companies have the same president.

3. The Central Railroad of New Jersey owns ninety per cent. of the capital stock of the Lehigh & Wilkes-

Barre Coal Company, and the two companies have the same president, who is also the president of the Reading Company and its two controlled companies.

4. The Erie Railroad Company owns all of the capital stock of the Pennsylvania Coal Company and a large majority of the stock of the Hillside Coal Company, and the three companies have the same president.

5. The New York, Susquehanna & Western Railroad Company owns nearly the entire capital stock of the New York, Susquehanna & Western Coal Company, and they have the same president, who is also the president of the Erie Railroad Company and of its two allied coal companies mentioned above.

6. The Delaware, Lackawanna & Western Railroad Company is itself an owner and producer of anthracite and seems to have no subsidiary coal company.

7. The Temple Iron Company. The relation of this company to the several carrier companies will be considered separately.

Excluding the Temple Iron Company the groups as arranged are independent of each other, and each group, in the absence of any agreement or combination, possesses the power to compete with every other in the production, sale and transportation of coal from the mines to tidewater. Indeed, the plain averment of the bill is that prior to 1896 they were actually competing in the market reached at New York harbor, and that the competition continued, except as interrupted by abortive or abandoned efforts to combine, until they entered into the general combination which it is the purpose of this proceeding to dissolve.

That the Delaware, Lackawanna & Western Railroad Company was itself the owner of coal lands and was engaged in mining, transporting and marketing its own coal, and that the other railway defendants were also engaged, through their subsidiary coal companies, in mining and

selling coal, as well as in transporting the coal so mined, is not determinative of any issue here presented, since this bill was filed before the Commodities clause of the Hepburn Act of June 29, 1906, 34 Stat. 584, c. 3591, became effective, which forbids any carrier engaged in interstate transportation from transporting coal for market, when the coal at the time of transportation is owned by the carrier company. See *United States* v. *D., L. & W. R. Co.*, 213 U. S. 366. Any relief against a continuance of such forbidden transportation must, therefore, be sought in another proceeding based upon the act of Congress referred to.

## *The Scope and Theory of the Bill.*

The theory upon which the bill is framed and upon which the case has been presented by counsel is, that there exists between the defendants a *general combination* to control the anthracite coal industry, both in respect of mining and transportation from the mines to the general consuming markets reached from shipping points at New York harbor, and the production and sale of coal throughout the United States.

The contention is that this *general combination* is established, first, by evidence of an agreement between the carrier defendants to apportion between themselves the total coal tonnage transported from the mines to tide-water according to a scale of percentages; second, by a combination between them, through the instrumentality of the defendant, the Temple Iron Company, to prevent the construction of a new and competing line of railroad from the mines to tide-water; third, by a combination between the defendants by means of a series of identical contracts for the control of the coal produced by independent coal operators, thereby preventing competition in the markets of other States between the coal of such independent operators and that produced by the defendants; and,

finally, by certain so-called contributary combinations, already referred to, between some, but not all, of the defendants.

Aside from the particular transactions averred as "steps" or "acts in furtherance" of a presupposed *general combination*, the charge of such a combination is general and indefinite.

The case is barren of documentary evidence of solidarity. The fact of such general combination, if it exists, must be deduced from specific acts or transactions in which the companies have united and from which such a general combination may be inferred. When and how did such a combination come about? We start with the proposition that if any such combination exists it had an origin not earlier than 1896. Attempts to bring about a suppression of competition prior to that time, indicated by some of the evidence, had either proved abortive or had been abandoned. Thus, it is stated that in 1890 and 1891 the price of coal of certain sizes at tide-water was from $3.71 to $3.85 per ton; that in 1892 the Philadelphia & Reading Railroad Company, the predecessor in title of the defendant the Philadelphia & Reading Railway Company, leased the lines of the Lehigh Valley Railroad Company and of the Central Railroad Company of New Jersey for nine hundred and ninety-nine years, and that the three companies together owned or controlled about eighty per cent. of the coal deposits of this anthracite region and transported nearly fifty per cent. of the entire tonnage; that while these leases were in force the price of coal was advanced to $4.15 and $4.19 per ton for the same sizes. It is then averred that in a proceeding in the courts of New Jersey these leases of the Central Railroad Company of New Jersey were held null and void, and that in 1893 this decree was followed by a rescission of the lease of the Lehigh Valley Railroad Company to the Philadelphia & Reading Railroad Company. It is then averred that

under the influence of competition thereby restored, the price of the same grade of coal in 1894 fell to $3.60 per ton and in 1895 to $3.12 per ton. *"Whereupon,"* the petition avers, "in violation of the provisions of sections 1 and 2, respectively, of the Act of Congress of July 2, 1890, . . . the defendants, the Reading Company, and the defendant carriers, and the defendant coal companies, owning or controlling 90 per cent., more or less, of all the anthracite deposits, and producing 75 per cent., more or less, of the annual anthracite supply, and controlling all the means of transportation between the anthracite mines and tide-water, save the railroads operated by the Pennsylvania Railroad Company and the New York, Ontario and Western Railway Company, which, as aforesaid, reach only a limited number of collieries, (not defendants here), entered into an agreement, scheme, combination, or conspiracy, by virtue whereof they acquired the power to control, regulate, restrain, and monopolize, and have controlled, regulated, restrained, and monopolized, not only the production of anthracite coal, but its transportation from the mines in Pennsylvania to market points in other States and its price and sale throughout the several States, with the result that competition in the transportation and sale of anthracite has been wholly suppressed and the price thereof greatly enhanced."

1. We come first to the evidence relied upon to show such a general combination through an agreement between the carriers to distribute the total tonnage of coal from this region to shipping points at New York harbor according to a scale of percentages spoken of as the "Presidents' percentages."

There is some evidence tending to show that early in 1896 there was an effort made at a conference of the presidents of the carrier companies to distribute the coal tonnage between the several carriers, based upon the

average percentage of coal carried in prior years by each carrier. The limited character of the coal field, the control of so large a proportion of the deposits and of the transportation, was such as to invite agreements and combinations. A pooling arrangement would largely prevent competition between the otherwise independent groups of carriers and producers. That any such pooling agreement was made is denied most earnestly by all of the defendants. That there occurred a conference in 1896 looking to such an arrangement seems probable on the evidence. But the weight of proof satisfies us that whatever might have been contemplated or attempted, the scheme proved abortive, or, if attempted, was abandoned long before this bill was filed. We do not set out the circumstances which are pointed out as tending to show such an illegal agreement, nor do we deem it necessary to discuss the conflicting direct testimony. We have gone through the record. The facts are discussed and largely set out in the opinion of the court below. Though its judges differed in respect to the relief which might be granted upon other grounds, they agreed in holding that the Government had failed to show any contract or agreement for the distribution of tonnage. In this we concur.

*The Temple Iron Company Combination.*

2. We come, then, to the several acts, agreements or transactions set out in the seventh paragraph of the bill, two of which are said to have been participated in by all of the defendants, and therefore to constitute evidence of the general combination charged, and to be, in and of themselves, illegal combinations between all of the principal defendants which come under the frame of the bill as in violation of the act of July 2, 1890, 26 Stat. 209, c. 647.

The transactions referred to are introduced immediately following the general charge, and are characterized in the

bill as "steps in the development of this illegal combination and in furtherance of its illegal purposes." It is then averred, that "the defendants, or some of them, became parties to the following additional acts, schemes and contracts, among others, in violation of the aforesaid Act of July 2, 1890." This is followed by five distinct paragraphs, each setting out some distinct contract, combination or agreement alleged to have been the act of all of the defendants, or of two or some number less than all. These alleged "steps" and "additional acts, schemes and contracts," in violation of the Sherman law and in furtherance of the alleged illegal general scheme or purpose,—are: *a.* the making of the sixty-five per cent. contracts with the independent operators; *b.* the absorption by the Erie Railroad of the New York, Susquehanna & Western Railroad Company; *c.* the acquisition by the Reading Company of the majority of the capital stock of the Central Railroad of New Jersey; *d.* the acquisition of the Temple Iron Company, and through it of a large number of collieries, for the purpose of defeating a projected independent line of railway into the coal region; and, *e.* the acquisition by the Erie Railroad Company, while controlling the Hillside Coal & Iron Company, of all of the shares of the Delaware Valley & Kingston Railroad Company, a projected common carrier, and all of the shares of the Pennsylvania Coal Company.

As we have already stated, two of these transactions are averred to be transactions into which all of the defendants entered in pursuance of a common purpose and general design to suppress competition and restrain commerce in coal between the States.

The first which we shall consider is the alleged combination through the Temple Iron Company. Concerning this, the petition, in substance, states, that in 1898 many of the independent coal operators in the Wyoming or Northern field became dissatisfied with the transportation

and market conditions under which they were obliged to
conduct their collieries. Many contracts for the sale of
their coal to the defendant coal companies had expired
or were about to expire, and they demanded either lower
freight rates or better prices from the coal companies.
A competing line of railway from the Northern or Wyo-
ming zone of the anthracite region to a point on the Dela-
ware River, where connection would be made with two
or more lines extending to shipping points at New York
harbor, was projected as a means of relieving the situation.
The New York, Wyoming & Western Railroad was
accordingly incorporated. Large subscriptions of stock
were taken, the line in part surveyed, parts of the right-
of-way procured, and a large quantity of steel rails con-
tracted for. As the road was to be mainly a coal-carrying
road, support from coal-mining companies was essential.
Its chief backing came from independent coal operators.
The most important and influential of them was the firm
of Simpson & Watkins, who controlled and operated
eight collieries in the region, having an annual output of
more than a million tons. The time for such a competing
means of transportation was auspicious. Much of the out-
put of the district not tied up by contracts of sale or trans-
portation was pledged to this project and much more was
promised.

The petition alleges that the construction of the pro-
jected independent railroad would not only have intro-
duced competition into the transportation of anthracite
coal to tide-water, but it would have enabled independent
operators reached by it to sell their coal at distributing
points in free competition with the defendant coal com-
panies. "*Wherefore*," avers the pleading, "the defendants,
the Reading Company, owning the entire capital stock of
the Philadelphia & Reading Railway Company, and the
other carrier companies defendants herein, controlling
collectively all means of transportation between the mines

and shipping points at New York harbor, combined to-gether for the purpose of shutting out the proposed rail-road and preventing competition with them in the transportation of coal from the mines to other States, and the sale of coal in competition with their own controlled coal in the markets of other States." The plan devised was to detach from the enterprise the powerful support of Simpson & Watkins and the great tonnage which their coöperation would give to the new road, by acquiring for the combination the coal properties and collieries controlled by that great independent firm of operators. This would not only strangle the project, but secure them forever against new schemes induced by the large tonnage produced by these eight collieries, and secure not only that tonnage for their own lines, but keep the coal forever out of competition with that of their controlled coal-producing companies.

The scheme was worked out with the result foreseen and intended. The capital stock of the Temple Iron Company, aggregating only $240,000, was all secured. That company was then operating a small iron furnace near Reading. Its assets were small, but its charter was a special legislative charter which gave it power to engage in almost any sort of business, and to increase its capital substantially at will. Control of that company having been secured, it was used as the instrument for the purpose intended.

The plan by which the defendant carriers were enabled to carry out this scheme and apportion among themselves proportionate interests in the property acquired and the burden to be assumed was not simple, but elaborate. The financial arrangements seem to have been made through Mr. Baer, who was the president of and a large stockholder in the Temple Company, and Mr. Robert Bacon, of the firm of J. P. Morgan & Company. Shortly stated, it was this: The Temple Company increased its

capital stock to $2,500,000 and issued mortgage bonds
aggregating $3,500,000. Simpson & Watkins agreed to
sell to the Temple Company their properties for some-
thing near $5,000,000. They accordingly transferred to the
Temple Company the capital shares in the several coal
companies, holding the title to their eight collieries, and
received in exchange $2,260,000 in the shares of the
Temple Company, and $3,500,000 of its mortgage bonds.
By contemporaneous instruments Simpson & Watkins
transferred to the defendant, the Guaranty Trust Com-
pany of New York, as trustee, this capital stock and
$2,100,000 of the bonds of the Temple Company, and
received from the Guaranty Company, $3,238,396.66
in money and $1,000,000 in certificates of beneficial
interest in the stock of the Temple Company. The
Guaranty Company seems to have been but a medium
and was accordingly protected by a contemporaneous
contract with the Reading Company and the other
carrier defendants by which they severally contracted
with the Guaranty Company to purchase the Temple
Company's capital stock in a certain agreed proportion
or percentage of the total capital stock, and to guarantee
the bonded debt of the Temple Company in the same
proportion. A large proportion of the bonds and of the
beneficial certificates of interest in stock of the Temple
Company was later guaranteed, or underwritten as the
stock phrase goes, by a syndicate including J. P. Morgan,
William Rockefeller, the Guaranty Company and others.

Thus, it came about that when this bill was filed the
stock of the Temple Company, which, as seen, is a mere
holding company for the several defendant carrier com-
panies, was owned by the defendants, and the obligations
of that company were guaranteed by them in propor-
tions based on the percentage of the total anthracite ton-
nage carried annually by each of the defendant carriers,
namely: The Reading Company and the Reading Rail-

way Company, being treated as one and the same in this matter, 29.96%; the Lehigh Valley Railroad Company, 22.88%; the Central Railroad of New Jersey, 17.12%; the Delaware, Lackawanna & Western Railroad Company, 19.52%; the Erie Railroad Company, 5.84%; the New York, Susquehanna & Western Railroad Company, 4.86%. At the time this proof was taken the average annual output of the collieries thus acquired was about 1,600,000 tons, and in the last year the output had arisen to 1,950,000 tons. This combination of the defendants through the Temple Iron Company was effective in bringing about the designed result. The New York, Wyoming & Western Railroad Company was successfully strangled, and the monopoly of transportation collectively held by the six defendant carrier companies was maintained.

The projected competing railroad was undoubtedly a good faith proposition and held out promise to independent coal operators not only of the prospect of competition in transportation from the mines to tide-water, but the possibility of selling their coal either to the controlled coal companies defendant at better prices or to the consuming public at tide-water in competition with that of the controlled coal companies. But if we assume that its construction was doubtful, the result must be the same as characterizing the purpose and design of the concerted action of the defendants. They were so far convinced of the threatening character of the enterprise that they were moved at great cost to thwart it and at the same time remove the temptation for like competition by securing to themselves forever the product of the collieries named.

. That the collieries to be reached by the new road were not all reached by each of the defendants is true. The great bulk of tonnage from them seems to have been carried by the Erie, the Lehigh and the Lackawanna. But the preservation of the monopoly of transportation

from the mines to tide-water held by the six lines which
were serving the region, was plainly a common interest,—
a collective monopoly by which the profits in coal could
be secured and the monopoly maintained by shutting
out any new line to tide-water. The extent of the interest
of each in the desired result seems to have been estimated
by themselves as fairly measured by the percentage of the
total tonnage theretofore carried annually by each. Thus
it was that they became owners of the shares in the Temple
Company, and guarantors of its obligations in the same
porportions.

It has been suggested that since the New York, Wyo-
ming & Western Railroad has been effectively strangled
that it will be idle to enjoin the doing of an act already
accomplished. But that is a narrow view of the relief
which may be granted under the statute and the frame
of this bill.

The combination by means of the Temple Company still
exists. It has been and still is an efficient agency for the
collective activities of the defendant carriers for the pur-
pose of preventing competition in the transportation and
sale of coal in other States.

That under the law of Pennsylvania each of the de-
fendant carrier companies has the power to acquire and
hold the stock of coal-producing companies may be true.
That the Temple Company may, under the same law,
have the power to acquire and hold the capital stock
of the Simpson & Watkins' collieries may also be conceded.
But if the defendant carriers did, as we have found to
be the fact, combine to restrain the freedom of interstate
commerce either in the transportation or in the sale of
anthracite coal in the markets of other States, and adopted
as a means for that purpose the Temple Company, and,
through it, the control of the great Simpson & Watkins'
collieries, the parts of the general scheme, however lawful
considered alone, become parts of an illegal combination

under the Federal statute which it is the duty of the court to dissolve, irrespective of how the legal title to the shares is held. *Harriman* v. *Northern Securities Co.*, 197 U. S. 244, 291. So long as the defendants are able to exercise the power thus illegally acquired, it may be most efficiently exerted for the continued and further suppression of competition. Through it, the defendants, in combination, may absorb the remaining output of independent producers. The evil is in the combination. Without it, the several groups of coal-carrying and coal-producing companies have the power and motive to compete. That each may for itself advance the price of coal or cut down the production, is true. But in the power which each other group would have to compete would be found a corrective. The statute forbids the concerted action which has already brought about the strangling of a projected competing railroad and the complete control of the sale of an immense tonnage of independent coal which had prior thereto not only been a menace to their collective control of the means of transportation to New York harbor points, but a large competing factor in sales at these points. The Temple Company, therefore, affords a powerful agency by means of which the unlawful purpose which induced its acquisition may be continued beyond the mere operation of the Simpson & Watkins' collieries.

Its board of directors includes the presidents of the defendant carriers, who also are the presidents of the defendant coal companies, and these defendant companies absolutely dominate its affairs. The Temple Company also owns and dominates the great collieries obtained from Simpson & Watkins. Its board of directors, composed as it is of men representing the defendants, supplies time, place and occasion for the expression of plans or combinations requiring or inviting concert of action. Though as a board it may not dictate the activities of

the owning corporations, still, in view of the relation of the Temple Company to the defendant carriers and their respective coal-mining companies, and of the constitution of its directors, the attitude of its board as indicated by the proceedings spread upon the corporate minutes is of significance upon the question of the existence of any concerted purpose to unite the activities of its corporate owners to suppress competition. There are to be found on the minutes of the Temple Company a number of entries which point strongly to combinations between the defendants. Thus, on June 27, 1899, a committee was appointed to consider the establishment of a statistical bureau, "to keep a record of all matters of interest to the anthracite companies." What resulted does not appear from any further minutes. On July 2, 1901, a resolution in these words was adopted:

"*Resolved*, That Mr. Cumming, Mr. Sayre, Mr. Henderson, Mr. Caldwell and Mr. Warren be appointed a committee to consider the advisability and expediency of making a 40 per cent. rate to outside shippers, or a flat rate, and, if so, what rate."

By "outside shippers" the witness says was meant "independent operators," who shipped their own coal. The witness by whom this action was proved says that he never saw the report and does not know that any was made by the committee. It is true that Mr. Baer, the president of the Temple Company, denied that the Temple Company had or undertook to exercise any power in respect of carrier rates, or in fixing prices of coal. He says that the minute entries referred to above are matters "interjected by somebody," under a misconception of the powers and duties of the directors of that company, and came to nothing. That he shortly took the presidency himself and that the Temple Company "has been run as the most harmless mining company in the State of Pennsylvania," and has had nothing to do with the

price of coal or with rates for transportation. But this disclaimer of power does not detract from the significance of the minutes of the Board referred to as evidence bearing upon the question of the relation of the several defendants to each other.

We are in entire accord with the view of the court below in holding that the transaction involved a concerted scheme and combination for the purpose of restraining commerce among the States in plain violation of the Act of Congress of July 2, 1890.

3. We come now to the sixty-five per cent. contracts.

The charge of the petition in respect to these contracts is substantially this:

a. That the defendant carriers possessed a substantial monopoly of all of the means of transportation between the coal region and tide-water.

b. That they directly or indirectly through their controlled coal companies produced about seventy-five per cent. of the annual supply of anthracite coal.

c. That twenty per cent. or more of the annual supply was produced by independent operators, whose collieries were located contiguous to the carrier lines of the defendant companies.

d. This being the situation, it is charged, that for the purpose of preventing the output of these independent producers "from being sold throughout the several States in competition with the output from their own mines, or of the mines of their subsidiary coal companies, the said defendant carriers, having almost a complete monopoly of the means of transportation between the anthracite mines and tide-water, entered into and now maintain an agreement, combination or conspiracy to use their power as said carriers to obtain control of the sale and disposition of the aforesaid output of the independent mines in the markets of the several States, particularly

of the great distributing market at New York harbor, in violation of the aforesaid Act of July 2, 1890."

It is further averred:

e. That prior to 1900 the defendants "severally made" a large number of short term contracts for the purchase of the coal of independent operators "along their respective lines," at prices ranging from fifty-five to sixty per cent. of the average price at tide-water.

That upon the termination of these contracts the defendants "in pursuance of a previous agreement between themselves, severally offered to make and did make and conclude with nearly all of the independent operators along their lines new contracts containing substantially uniform provisions agreed upon beforehand by the defendant carriers in concert, some of the operators contracting with one of the defendants and some with another," by which such operators "severally agreed" to deliver on cars at breakers "to one or the other of the defendant carriers, or its subsidiary coal company, all the anthracite coal thereafter mined from any of their mines now opened and operated, or which they might thereafter open and operate, deliveries to be made from time to time as called for," etc. In consideration, the sellers were to receive for prepared sizes sixty-five per cent. of the general average price prevailing at tide-water points at or near New York as computed from month to month, this average price to be settled by an expert agreed upon by the parties.

It is further averred that this price was such as to enable the independent operator entering into one of these contracts to realize upon his coal from fifteen to fifty cents more than he could when shipping on his own account after paying the established rates of transportation, waste and cost of selling, in competition with the coal of the defendants. That the difference was the price paid for the privilege of controlling the sale of the independent

output, "so as to prevent it from selling in competition with the output of their own mines."

It is then further alleged that the result of this plan, "as was intended, was to draw, if not to force, the great body of independent operators into making the aforesaid contracts, thereby enabling the defendants to control absolutely, and until the mines are exhausted, the output of most of the independent anthracite mines, and to prevent it, as aforesaid, from being sold in competition with the output of their own mines in the markets of the several States, particularly in the great tide-water markets."

It is obvious that the averments do not touch upon the legality of the contracts considered severally, and ask no relief upon the theory that each was a contract in restraint of trade. The theory and charge of the bill is that by concerted action between the defendants the independent operators were to be induced to enter singly into uniform agreements for the sale of the entire output of their several mines and any other they might thereafter acquire, excluding a negligible amount of unmarketable coal and coal for local consumption. And the further theory of the pleading is that by such concerted action and through the higher price offered, the defendants would obtain such control of independent coal as to prevent competition in the markets of other States.

It is not essential that these contracts considered singly be unlawful as in restraint of trade. So considered, they may be wholly innocent. Even acts absolutely lawful may be steps in a criminal plot. *Aikens* v. *Wisconsin,* 195 U. S. 194, 206. But a series of such contracts, if the result of a concerted plan or plot between the defendants to thereby secure control of the sale of the independent coal in the markets of other States, and thereby suppress competition in prices between their own output and that of the independent operators, would come plainly within the terms of the statute, and as parts of the scheme or plot

would be unlawful.  Thus in *Swift & Company* v. *United States*, 196 U. S. 375, 396, where a plan or scheme consisting in many parts or elements was averred to constitute a combination forbidden by the act of July 2, 1890, it was said:

"The scheme as a whole seems to us to be within reach of the law.  The constituent elements, as we have stated them, are enough to give to the scheme a body and, for all that we can say, to accomplish it.  Moreover, whatever we may think of them separately when we take them up as distinct charges, they are alleged sufficiently as elements of the scheme.  It is suggested that the several acts charged are lawful and that intent can make no difference.  But they are bound together as the parts of a single plan.  The plan may make the parts unlawful."

That the plan was calculated to accomplish the design averred, in the present case, seems plain enough.  The anthracite field was very limited.  The means for transportation from the mines to seaboard shipping points were in the hands of the defendant carriers.  They, together with their subsidiary companies, controlled about ninety per cent. of the coal deposit and about seventy-five per cent. of the annual output.  If the remaining output, that of the independent operators along their several lines, could be controlled as to production and sale at tide-water points, there would inevitably result such a dominating control of a necessity of life as to bring the scheme or combination within the condemnation of the statute.

That these sixty-five per cent. contracts were the result of an agreement through protracted conferences between the independent operators, acting through an authorized committee, and officials of the carrier defendants, who were likewise officials of the coal companies subsidiary to the railroad companies, is plainly established.  That they were designed by the defendants

as a means of controlling the sale of the independent output in the market at tide-water points, thereby preventing competition with their own coal and as a plan for removing the great tonnage controlled by the independents from being used as an inducement for the entry of competing carriers into the district, is a plain deduction.

Some of the facts which lead to this conclusion will be referred to as briefly as the great importance of the case will permit:

That for a long time many of the independent operators had been selling their output to their great rivals, the defendant carriers and their, several coal companies, is true. By means of such sales and deliveries at their own breakers, the sellers avoided freight, waste and expense of sales through agents, etc. The price they would thereby realize was fixed, and they were not dependent upon a fluctuating market. So long, therefore, as they could sell to their rivals at their breakers to better advantage than they could ship and sell on their own account, the method appealed to them. But, obviously, buyer and seller were not upon an equal plane. The former had control of freight rates and car service. The seller must pay the rate exacted and accept the car service supplied him by the buyer, or appeal to the remedies afforded by the law. If the rate of freight to tide-water was onerous and was imposed upon the coal produced by the defendants and their allied coal producers without discrimination against the coal of the independent shipper, it would nevertheless bear upon the latter oppressively, since the rate paid would find its way into the pocket of the defendants. Therefore, it was that the higher the freight rate, the greater the inducement to sell to the carrier companies. That the conditions were not accepted by the independent producers as satisfactory, is evident. The majority at all times stood out, and those making such agreements as well as those refusing to do so, maintained

an agitation for better freight rates and better prices for those who preferred to sell at their breakers. For many years before this proceeding they maintained an organization called "The Anthracite Coal Operators' Association," and through that body endeavored to improve their situation.

The series of contracts here involved were all made since 1900, and are therefore subsequent to the combination through the Temple Iron Company, already considered. The charge is that since that combination the defendants further combined through these contracts. Prior to 1900, we find no evidence of any combination or agreement for the procurement of contracts of sale with independent operators. Upon the contrary there is much to indicate that there was more or less competition for coal accessible to more than one of the buying defendants. The effect of competition is shown by the gradual rise in the price the great companies were willing to pay. In the earliest stages of the business the buying price seems to have been fixed with some relation to the varying wage scale of miners. This gave way to an agreed percentage of the current price at tide-water. Thus the earlier contracts allowed the selling operator only forty per cent. of the tide-water price for prepared sizes. Through competition between the existing companies, and through that which resulted from the entry of new carrier lines with their subsidiary coal companies, the price was forced gradually up from forty to sixty per cent. of the tide-water price, and at this latter figure the price stood when the combination here averred came into existence.

We have mentioned the influence of the coming into the region of new coal-carrying railroads upon the per cent. of the tide-water price which the independent operators were able to obtain from the buying coal companies. This influence, as we shall see, was a large factor in bringing about the contracts now in question. The carriers

here defendant did not all obtain their footing in this anthracite field at the same time. Thus, when the New York, Susquehanna & Western was projected, it, through its coal company, offered to buy coal on fifty per cent. contracts. The price before that had been forty to forty-five per cent. The result was that the other companies came gradually up to the same price. This was late in the eighties, the exact date not being at hand. Again, it is said in the brief for the defendants, that:

"In the early 90's, the New York, Ontario & Western Railroad built a branch into the Wyoming region and sought tonnage. Mr. Sturgis was commissioned beforehand by the coal company of that railroad to offer 60%. contracts on the understanding that, if he could secure a half million tons annually, the branch would be built. The branch railroad was built, and by its help large new acreages of coal lands were developed, tributary to the Ontario & Western Railroad."

As a consequence, says the same brief, "the other coal companies began to raise their rates to sixty per cent.," and by 1892 that had become the settled price.

The influence of competition, actual or threatened, was also illustrated in 1898, when the New York, Wyoming & Western was projected. A large number of coal contracts had expired or were about to expire, thus creating a great tonnage open to competition. Many of the operators in the Wyoming region of the coal field united their influence to procure the building of a competing line between the mines and New York harbor points. To this end a large tonnage was pledged to its coal-selling company, which offered to pay sixty-five per cent. of the tide-water price to such operators. How and why that project failed we have already shown in the section of this opinion devoted to the Temple Iron Company combination.

When that effort failed there arose a movement for a

new road from the mines to tide-water through the Pennsylvania Coal Company. That was one of the greatest of the independent companies, producing in 1899 about two million tons. It controlled a coal-gathering railroad called the Erie & Wyoming Valley Railroad, and proposed its extension to Lackawaxen, and to cause the construction from that point of a railroad line to the Hudson River. To this end it caused to be organized the Delaware Valley & Kingston Railroad. Of this project, Mr. Thomas, the president of the Erie Railroad Company, said: "They were threatening and had started to build a competing road to the Hudson River." The independent operators, in an association maintained by them for their mutual protection, hailed this scheme with joy. At a meeting of the association on November 22, 1899, the following minute was made:

"Mr. E. L. Fuller, chairman of the executive committee, on being called upon, told of the efforts which have been made to induce the various anthracite railroads to offer more satisfactory terms for the purchase of the operators' coal, and of the absolute failure of these efforts to bring about any definite result. He then reported the organization of the Delaware Valley & Kingston Railroad, backed by the Pennsylvania Coal Company, and the proffer of this latter company to purchase coal from operators in the Wyoming and Lehigh region, paying 65 per cent. of the tide-water price for chestnut and larger; 50 per cent. for pea coal, and a flat 85 per cent. freight rate on buckwheat and smaller sizes. These contracts were to be for all of the coal in the ground, thus settling permanently the price which the operator would receive.

"After extended discussion as to the details of these contracts, and a comparison with the results obtained under the old contracts, the following resolution was offered and passed unanimously:

"'Whereas the Erie & Wyoming Valley Railroad Com-

pany has arranged to build a branch line from Hawley, Pa., to a point on the boundary line between New York and Pennsylvania at Lackawaxen, forming a connection with a railroad proposed to be constructed by the Delaware Valley and Kingston Railroad Company to tidewater, at Kingston, on the Hudson River;

"'And whereas the construction of the said railroads is approved and promoted by the Pennsylvania Coal Company, which has large interests in the anthracite coal region;

"'And whereas the independent operators and the general public are now largely at the mercy of the existing railroad companies, which charge unreasonable rates for their services, owing in part to the large amounts for which the said companies have been capitalized;

"'And whereas it would be highly advantageous to all the independent owners of coal properties throughout the entire anthracite region of Pennsylvania to have the railroad connection, now proposed, completed as speedily as possible;

"'And whereas it is equally desirable, in the interests of the people of the State of New York and the public in general, that such railroad connection shall be made (since it will necessarily result in a material reduction of the price paid for anthracite coal by consumers), now, therefore, it is

"'*Resolved*, I. That this association hereby expresses its hearty and unqualified approval of the proposed plan for the construction of the said railroads, and hereby pledges its constant support and active assistance in promoting the speedy construction and completion of the said railroads.

"'II. That a committee of three be appointed by the president, of which the president shall be a member, to take such steps as may be deemed advisable toward furthering the said plans and coöperating with the said com-

panies for the completion of the said railroads, and that a report of their proceedings be submitted to the next meeting of this association.'

"In the discussion which followed, it was the opinion of those present that, in view of the hearty assistance which had been accorded the operators by the Pennsylvania Coal Company, it was the duty of the members to give to this company all of the tonnage which they could deliver and not to permit any more advantageous offers which the older companies might make, to divert freight from a road which was constructed to give the operators a fair share in the selling price. A vote of thanks was accorded Mr. Fuller for his labor and great success in accomplishing a work which was for the advantage of every individual operator in the anthracite regions."

It is enough to say of this project that it was abandoned when, in 1901, the Erie Railroad acquired, without any concert of action between it and the other carrier defendants, the capital stock of the Pennsylvania Coal Company, which carried with it the capital stock of the Erie & Wyoming Valley Railroad and the Delaware & Kingston Railroad.

The persistent effort of the independents to bring into the field competing carrier and coal-producing companies was a menace to the monopoly of transportation from that field to tide-water which the defendants collectively possessed. The independent output was one-fourth of the annual supply. It was mainly sold at tide-water, where it came into active competition with the larger production of the defendants; but, as we have already seen, this enormous tonnage offered a great inducement to the organization of new carrier lines from the mines to the seaboard. The contracts theretofore made for the purchase of this output had been for short terms. The expiration of a considerable number had more than once been the occasion for new carrier projects backed by the

independent operators. To renew the contracts for short terms would but postpone the day of competition. The control in perpetuity of such a large proportion of the output as would prevent in the future effective competition in the selling markets of the coast, and at the same time remove inducement to the entry of other lines of carriers, was the obvious solution of the situation. The necessary control could only come about through concerted action. If one of the several independent groups of defendants, or two, or any less number than all, had sought to obtain control, it would have been resisted by those not included. Therefore, it is plain that if the coal of these operators was to be placed in such situation as that it could not affect the price of their own coal, nor longer constitute a mass of tonnage sufficient to invite the construction of new lines from the mines to the sea, it must be brought about through the concerted action of the defendants.

In 1900 there occurred the great strike of the coal miners. Settled by arbitration in the fall of that year, the miners obtained a ten per cent. increase in wages. Of course, this affected the railroad coal-producing companies and the independent coal companies alike. The great companies took the lead in the arbitration and accepted the result. The independent companies were compelled to follow this lead. The latter, as we have seen, had before the strike been particularly urgent in their efforts to secure better conditions from the railroads and their allied coal companies. This rebellious attitude is partially shown by the resolution of the Anthracite Coal Operators' Association of November 22, 1899, heretofore set out. When the strike settlement was made, there was some hesitation among the independent operators about posting notice of the advance in wages, and through committees they urged upon the defendants that such advance in wages justified a reduction in freight rates and a price of not less

than sixty-five per cent. for coal sold to the defendant companies. The committees reported back that they could not obtain "any definite promise," but there has been "an intimation" that something would be done to improve the present conditions. It was thereupon resolved that the advance scale should be posted, and that a committee should be appointed "to confer with the various carrier companies, relative to a new contract." At the same meeting a number of the operators present signed an agreement empowering the committee named "to adjust all differences with certain transportation companies," and agree upon a basis of contract which should definitely and for a period of years fix the commercial relations between the said operators and the transportation companies, "each of the parties agreeing to make a particular contract for himself with the proper transportation company." This agreement, after being signed by those present, was placed in the hands of Mr. McNulty to secure further signatures. These matters appear on the minutes of the individual operators of October 5th. There ensued a number of conferences between the representatives of the sellers and buyers. The result was that a form of contract and a price was mutually agreed upon, being the form of the sixty-five per cent. contracts, which were thereafter entered into as the short term agreements theretofore made expired. Thus the independents put in force the advance wage scale imposed by the strike arbitrators before any agreement whatever was made or promised by the defendants. This increased scale which the arbitration imposed having been accepted by the large companies, could not be successfully resisted by the independents. It only operated to make them more persistent in their demand for some improvement in the methods and prices theretofore prevailing.

That the defendant companies should offer such terms is not surprising. The contracts to be made would be not

only for the life of the mines being operated at the date of the sale, but was to extend to any other mines thereafter opened by the seller. The menace of the independent output as an invitation to competing carriers and as a competing coal at tide-water would be removed forever.

Upon this aspect of the case we find ourselves in agreement with Judge Buffington, who concluded a discussion of the evidence by saying (183 Fed. Rep. 474):

"By such perpetual contracts . . . these defendant railroads through their subsidiary coal companies severally made with other collieries these combiners withdrew, and still continue to withdraw, such product, for all time, from competition, either in interstate transportation or sale. To my mind there is no more subtle and effective agency for the gradual, unnoted absorption by interstate carriers of the remaining interstate product than these perpetual contracts. Holding then that they are in the words of the statute, 'contracts . . . in restraint of trade or commerce among the states,' I record my dissent to the action of the court in refusing to enjoin them."

The coal contracts acquired when this proceeding was begun aggregated nearly one-half the tonnage of the independent operators. Much of the coal so bought was sold in Pennsylvania and all of the contracts were made in that State and the coal was also there delivered to the buying defendants. That the defendants were free to sell again within Pennsylvania, or transport and sell beyond the State, is true. That some of the coal was intended for local consumption may also be true. But the general market contemplated was the market at tide-water, and the sales were made upon the basis of the average price at tide-water. The mere fact that the sales and deliveries took place in Pennsylvania is not controlling when, as here, the expectation was that the coal would, for the most part, fall into and become a part of the well-known current of commerce between the mines and the

general consuming markets of other States. "Commerce among the States is not a technical legal conception, but a practical one, drawn from the course of business." *Swift & Company* v. *United States*, 196 U. S. 375, 398; *Loewe* v. *Lawlor*, 208 U. S. 274. The purchase and delivery within the State was but one step in a plan and purpose to control and dominate trade and commerce in other States for an illegal purpose. As was said by the Chief Justice, in *Loewe* v. *Lawlor*, (p. 301) cited above:

"Although some of the means whereby the interstate traffic was to be destroyed were acts within a State, and some of them were in themselves as a part of their obvious purpose and effect beyond the scope of Federal authority, still, as we have seen, the acts must be considered as a whole; and the plan is open to condemnation, notwithstanding a negligible amount of intrastate business might be affected in carrying it out. If the purposes of the combination were, as alleged, to prevent any interstate transportation at all, the fact that the means operated at one end before physical transportation commenced and at the other end after the physical transportation ended was immaterial."

The general view which this court took of the effect of these contracts upon interstate traffic in the coal of this region is indicated in *Interstate Commerce Commission* v. *Baird*, 194 U. S. 25, 42. The concerted plan concerned the relations of these railroads to their interstate commerce and directly affected the transportation and sale and price of the coal in other States. The prime object in engaging in this scheme was not so much the control and sale of coal in Pennsylvania, but the control of sales at New York harbor.

That per cent. of the average price at tide-water retained by the buyer was assumed to cover the freight, waste and cost of sale. There is evidence tending strongly to show that an independent accepting one of these con-

tracts realized slightly more than he could realize if he had shipped and sold on his own account. This advanced price, therefore, as charged in the bill, constituted a great inducement to draw the independents within the control of the defendants, and makes it highly probable that if not enjoined they will absorb the entire independent output.

The defendants insist that these contracts were but the outgrowth of conditions peculiar to the anthracite coal region and are not unreasonably in restraint of competition but mutually advantageous to buyer and seller.

That the act of Congress "does not forbid or restrain the power to make normal and usual contracts to further trade by resorting to all normal methods, whether by agreement or otherwise, to accomplish such purpose," was pointed out in the *Standard Oil Case*, 221 U. S. 1. In that case it was also said that "the words 'restraint of trade,' should be given a meaning which would not destroy the individual right of contract, and render difficult, if not impossible, any movement of trade in the character of interstate commerce, the free movement of which it was the purpose of the statute to protect." We reaffirm this view of the plain meaning of the statute, and in so doing limit ourselves to the inquiry as to whether this plan or system of contracts entered into according to a concerted scheme does not operate to unduly suppress competition and restrain freedom of commerce among the States.

Before these contracts there existed not only the power to compete but actual competition between the coal of the independents and that produced by the buying defendants. Such competition was after the contracts impracticable. It is, of course, obvious that the law may not compel competition between these independent coal operators and the defendants, but it may at least

remove illegal barriers resulting from illegal agreements which will make such competition impracticable.

Whether a particular act, contract or agreement was a reasonable and normal method in furtherance of trade and commerce may, in doubtful cases, turn upon the intent to be inferred from the extent of the control thereby secured over the commerce affected, as well as by the method which was used. Of course, if the necessary result is materially to restrain trade between the States, the intent with which the thing was done is of no consequence. But when there is only a probability, the intent to produce the consequences may become important. *United States* v. *St. Louis Terminal Association*, 224 U. S. 383, 394; *Swift & Co.* v. *United States*, 196 U. S. 375.

In the instant case the extent of the control over the limited supply of anthracite coal by means of the great proportion theretofore owned or controlled by the defendant companies, and the extent of the control acquired over the independent output which constituted the only competing supply, affords evidence of an intent to suppress that competition and of a purpose to unduly restrain the freedom of production, transportation and sale of the article at tide-water markets.

The case falls well within not only the *Standard Oil* and *Tobacco Cases*, 221 U. S. 1, 106, but is of such an unreasonable character as to be within the authority of a long line of cases decided by this court. Among them we may cite: *Northern Securities Company* v. *United States*, 193 U. S. 197; *Swift & Co.* v. *United States*, 196 U. S. 375; *National Cotton Oil Company* v. *Texas*, 197 U. S. 115; *United States* v. *St. Louis Terminal Association*, 224 U. S. 383, and the recent case of *United States* v. *Union Pacific Railway*, *ante*, p. 61.

We are thus led to the conclusion that the defendants did combine for two distinct purposes,—first, by and through the instrumentality of the Temple Iron Company,

with the object of preventing the construction of an independent and competing line of railway into the anthracite region; and, second, by and through the instrumentality of the sixty-five per cent. contracts with the purpose and design of controlling the sale of the independent output at tide-water.

. The acts and transactions which the bill avers to have been committed by some of the defendants in furtherance of the illegal plan and scheme of a general combination, are these:

· a. The absorption in January, 1898, of the New York, Susquehanna & Western Railroad, through the purchase by the Erie Railroad of a large majority of its shares, whereby two lines of competing railroad came under one control and management.

· b. The acquisition in 1901 of a controlling majority of the capital stock of the Central Railroad of New Jersey by the Reading Company, which then owned the entire capital stock of the Philadelphia & Reading Railway Company, and the Philadelphia & Reading Coal & Iron Company, "thereby uniting and bringing together under a common head and source of control the said Philadelphia & Reading Railway Company and Central Railroad Company of New Jersey, operating parallel and competitive lines of railroad, and the said Philadelphia & Reading Coal & Iron Company and Lehigh & Wilkes-Barre Coal Company," theretofore owned or controlled by the Central Railroad of New Jersey, thereby destroying competition between former competing carriers and coal-producing companies.

c. The absorption in 1899 by the Erie Railroad Company of the Pennsylvania Coal Company, thereby acquiring the stock control of the Erie & Wyoming Railroad Company and of the Delaware Valley & Kingston Railroad, thus defeating a projected construction of the last named railroad.

These were all minor combinations in which only some of the defendants participated. The accomplishment of these several subordinate transactions only completed one or another of the several groups of carriers and coal-producing companies, which several groups were thereafter not only possessed of the power to compete with every other group, but, as we have already seen, were actually engaged in competing, one with another, prior to the general combination through the Temple Iron Company and the sixty-five per cent. contract scheme.

So far as this record shows not one of these transactions was the result of any general combination between all of the defendants and constituted no part of any such general combination. None of the defendants had any part or lot in bringing them about except the particular combining companies.

It is true that the bill asks injunctions against the continuance of each of these minor combinations. But if, as we conclude, they did not constitute any part of any general plan or combination entered into by all of the carrier companies, their separate consideration as independent violations of the act of Congress is not admissible under the general frame of this bill. To treat the bill as one seeking to apply the prohibition of the act of Congress to each one of these independent combinations would condemn the pleading as a plain misjoinder of parties and of causes of suit, and a plain confession of multifariousness. All of the defendants had a common interest in the defense of the Temple Iron Company combination, and that of the sixty-five per cent. contracts, because it was alleged that all had joined therein. But all of the defendants did not have a common interest in the defense of these three minor combinations, unless it appear that they were, as charged, "steps," or acts and agreements in furtherance of the general combination to which they were all parties. This we find not to be the fact. If, therefore, we shall

treat the bill as broad enough to involve combinations which were not steps or acts in furtherance of any general combination, we shall overrule the objection of multifariousness made below and here, for we shall then maintain a bill setting up three separate and distinct causes of action against the distinct groups of defendants, one having no interest in or connection with the other. The grounds of each suit would be different and the parties defending different. See the discussion and cases cited in Simpkins' Federal Equity Suit, pp. 290 *et seq.*

Having failed to show that these minor combinations were acts in furtherance of the general scheme, or the acts of the combiners in the two combinations condemned, we are asked to deal with them as separate illegal combinations by such of the defendants as participated. This the court below declined to do, and we in this find no error.

As to the legality of the minor combinations, we therefore express no opinion. We affirm the action of the court below in declining to enjoin them, because to construe the bill as directed against them as independent combinations, between some but not all of the principal defendants, would make the pleading objectionably multifarious. We therefore direct that the bill be dismissed, without prejudice, in so far as it seeks relief against the three alleged minor combinations.

> *The decree of the court below is affirmed as to the Temple Iron Company combination. It is reversed as to the sixty-five per cent. contracts, and the case will be remanded with direction to enter a decree cancelling each of these contracts, and perpetually enjoining their further execution, and for such proceedings as are in conformity with this opinion.*

MR. JUSTICE DAY, MR. JUSTICE HUGHES and MR. JUSTICE PITNEY did not participate in the consideration or decision of this case.