# CASES

## ARGUED AND DETERMINED

### IN THE

# UNITED STATES CIRCUIT COURTS OF APPEALS AND THE DISTRICT COURTS

---

## DOWD v. UNITED MINE WORKERS OF AMERICA et al. *

### (Circuit Court of Appeals, Eighth Circuit. July 21, 1916.)

### No. 4623.

1. **APPEAL AND ERROR** ⊂⊃866(1)—REVIEW—QUESTIONS CONSIDERED—JUDGMENT ON DEMURRER.

On writ of error from a judgment dismissing an action on demurrer to the complaint, the appellate court is not limited to a consideration of the particular ground of demurrer sustained by the trial court, but all questions raised by the demurrer are reviewable.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3467–3473; Dec. Dig. ⊂⊃866(1).]

2. **MONOPOLIES** ⊂⊃28—ANTI-TRUST ACT—ACTION FOR VIOLATION—PARTIES DEFENDANT—"ASSOCIATIONS."

In Anti-Trust Act, July 2, 1890, c. 647, § 8, 26 Stat. 210 (Comp. St. 1913, § 8830), providing that the word "person" or "persons," whenever used in the act, shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the territories, the laws of any state, or the laws of any foreign country, the word "associations" includes unincorporated associations, such as labor organizations recognized by federal and state legislation as lawful, and such an organization may be sued by its name, under section 7, by one injured in his business or property by its action in violation of the provisions of the act.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. ⊂⊃28.

For other definitions, see Words and Phrases, First and Second Series, Association.]

3. **MONOPOLIES** ⊂⊃28—ANTI-TRUST ACT—ACTION FOR DAMAGES—SUFFICIENCY OF COMPLAINT.

The complaint in an action brought under section 7 of the Anti-Trust Act by the receiver of certain coal companies against a labor organization and its constituent organizations to recover damages for injury to the business and property of the coal companies by reason of a conspiracy and combination of defendants in violation of the act, and acts done by them pursuant thereto, considered, and *held* to state a cause of action as against a general demurrer.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. ⊂⊃28.]

4. **MONOPOLIES** ⊂⊃28—ANTI-TRUST ACT—ACTION FOR DAMAGES—DEFENSES.

That a plaintiff in such an action was not, at the time of the alleged unlawful acts of defendants, actually engaged in interstate commerce,

---

does not deprive him of a right of action, where he was preparing to so engage, and was prevented by the wrongful acts of defendants.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. ☞28.]

5. MONOPOLIES ☞28—ANTI-TRUST ACT—ACTION FOR DAMAGES—DEFENSES.

That the alleged unlawful acts of defendants did not relate directly to interstate commerce is not a defense, where it was their purpose to restrain such commerce, and that was their necessary, although indirect, effect.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 18; Dec. Dig. ☞28.]

In Error to the District Court of the United States for the Western District of Arkansas; Frank A. Youmans, Judge.

Action at law by A. S. Dowd, as receiver for the Coronado Coal Company and others, against the United Mine Workers of America and others. Judgment for defendants, and plaintiff brings error. Reversed.

Henry S. Drinker, Jr., of Philadelphia, Pa., and James B. McDonough, of Ft. Smith, Ark. (Walter Gordon Merritt, of New York City, on the brief), for plaintiff in error.

G. L. Grant and Webb Covington, both of Ft. Smith, Ark. (Henry Warrum, of Indianapolis, Ind., on the brief), for defendants in error.

Before SANBORN, ADAMS, and CARLAND, Circuit Judges.

CARLAND, Circuit Judge. Dowd, hereafter called plaintiff, as receiver of nine coal mining companies, commenced this action against the defendants in error, hereafter called defendants, to recover damages resulting from an alleged unlawful conspiracy and combination formed by them in restraint of trade and commerce among the several states of the United States, in violation of the act of July 2, 1890 (26 Stat. 209). The defendants named in the complaint are the United Mine Workers of America, about 27 local unions of the same, and numerous individual defendants, comprising, among others, the president and other officers of the United Mine Workers of America and the presidents and other officers of the district branches and local unions of the same.

The complaint alleges that the United Mine Workers of America is an unincorporated association of mine workers, engaged in or about the work of mining and shipping coal in and from the different mines throughout the United States, its headquarters being located at the city of Indianapolis, in the state of Indiana; that the members of said association are subdivided into about 30 districts, and numerous local unions are located therein, each district having jurisdiction of the local unions within its territory; that every member of said local unions is a member of the United Mine Workers of America, and subject to the rules laid down in its constitution and by-laws, as well as the constitution and by-laws of the various district and local unions having jurisdiction over them, respectively; that the membership of the United Mine Workers of America exceeds 400,000 miners; that

each of the district branches and local unions, which are a part of the United Mine Workers of America, are created by said United Mine Workers of America to carry out the purposes and business of said national organization, and more particularly to act with and for said national organization in carrying out the combination and conspiracy in respect of interstate trade and commerce set forth in the complaint; that the defendant United Mine Workers of America, District 21, is one of the said district branches of said United Mine Workers of America, and has jurisdiction over all union mines and miners in the states of Arkansas, Oklahoma, and Texas, and that all of the defendant local unions above named are affiliated with and subject to the laws of District 21; that the local unions named as defendants are unincorporated associations of mine workers in the state of Arkansas.

The United Mine Workers of America and the several unions demurred to the complaint upon the following grounds: (1) The court had no jurisdiction of the subject of the action, as it appeared from the complaint that neither of the coal companies were engaged in interstate commerce at the time of the alleged acts causing the damages sued for, within the meaning of the act of July 2, 1890. (2) The complaint failed to disclose that the court had any jurisdiction of the cause of action, for the reason that the acts complained of were not an interference with interstate commerce or a violation of the above act. (3) The court had no jurisdiction of the defendant or the subject of the action, for the reason that defendants United Mine Workers of America and the several local unions are voluntary unincorporated associations, and as such have no power to sue and cannot be sued. (4) The complaint does not allege any contract, combination, or conspiracy in restraint of trade or commerce within the meaning of the above act. (5) The complaint does not allege any acts of defendants monopolizing or attempting to monopolize, combining or conspiring to monopolize, any part of such trade or commerce within the meaning of the above act. Two other grounds of demurrer were mentioned, namely, a misjoinder of parties plaintiffs, and a misjoinder of causes of action. These grounds are not argued in the briefs, and will be deemed abandoned. The individual defendants demurred to the complaint upon the same grounds, except that no point was made that these defendants could not be sued. The court below sustained the demurrers upon the specific ground, as recited in the judgment:

"That the complaint fails to disclose that this court has any jurisdiction of the cause of action therein set forth, for the reason that the acts of defendants complained of were not an interference with interstate commerce, or a violation of the federal statute upon which the complaint is predicated."

The other grounds of demurrer were in terms overruled.

[1] As the plaintiff alone sued out a writ of error, it is contended that our power to review is limited to the point ruled against the plaintiff; but it was the demurrers that were sustained, and the scope of our power to review cannot be limited by the specific reason given by the court below for its judgment. Such judgment may be right or wrong, notwithstanding the reason given for it. The plaintiff

elected to stand upon the complaint, which was thereupon dismissed. Claiming the point to be jurisdictional, the United Mine Workers of America and the several unions made a motion in this court to dismiss the writ of error, upon the ground that defendants are voluntary unincorporated associations or labor unions, having no legal entity, not registered under any trade union law of the United States or of any state or territory, and cannot sue or be sued, and are not engaged in any kind of business.

All of the defendants made a similar motion, for the reason that the writ of error in this case should have issued from the Supreme Court of the United States. This motion is denied, for the reason that the judgment is properly reviewable by this court, the writ of error sued out by the plaintiff from the Supreme Court of the United States has been dismissed, and the point in reference to the plaintiff's right to sue the United Mine Workers of America and the different local unions by name, having been one of the grounds of demurrer in the court below, will be considered here on this writ of error, for the reasons hereinbefore stated, as the defendants still insist upon the point. The questions then for consideration are: (1) May the United Mine Workers of America and the different local unions be sued in the name of the association? (2) Does the complaint state a cause of action?

[2] The complaint was filed September 1, 1914, and the acts of which complaint is made are alleged to have occurred early the same year. Taking up the first question suggested, we find that section 7 of the act of July 2, 1890, reads as follows:

"Any person who shall be injured in his business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act may sue therefor in any Circuit Court of the United States in the district in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the costs of suit, including a reasonable attorney's fee."

Section 8 of the same act provides:

"The word 'person,' or 'persons,' wherever used in this act, shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the territories, the laws of any state, or the laws of any foreign country."

Section 4 of the act of Congress of October 15, 1914 (38 Stat. 731, c. 323), provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the anti-trust laws may sue therefor in any District Court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

It will be noticed that section 4 of the act of October 15, 1914, eliminates any description of the persons or corporation by whom the injury shall be committed, leaving the party injured free to pursue any one who causes the injury. It is claimed by the defendants the United Mine Workers of America and the several local unions that the word

"associations" found in section 8, above quoted, means associations which have a legal entity by reason of having been organized under the laws of the United States, their territories, the states, or the laws of a foreign country; that the words "existing under" or "authorized by" mean that the word "association" refers only to an association having a legal entity by force of law; and that the United Mine Workers of America and the local unions, not having been shown in this case to be organized under any particular law, may not be held liable under section 7, above quoted, in the name of the association. Such a construction of the law would relieve labor organizations generally from all liability.

The United States Supreme Court in Loewe v. Lawler, 208 U. S. 274, 301, 28 Sup. Ct. 301, 310 (52 L. Ed. 488, 13 Ann. Cas. 815), said:

"The records of Congress show that several efforts were made to exempt, by legislation, organizations of farmers and laborers from the operation of the act, and that all these efforts failed so that the act remained as we have it before us."

We are of the opinion that it was clearly not the intention of Congress to exempt any one from liability for injuries caused by combinations and conspiracies in restraint of interstate trade. We therefore decide that the word "associations," in section 8, includes unincorporated associations, such as the defendants are shown to be. The defendants, of course, will not take the position that the associations are outlaws, for they are continually recognized in the legislation of Congress and of the several states as lawful associations. A notable instance of this is contained in section 6 of the act of Congress of October 15, 1914, where it is said:

"Nothing contained in the anti-trust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the anti-trust laws."

The defendants, composing an organization of 400,000 miners, capable of doing great good or wrong, claim they are not liable to be sued in the name of the association, but that the injured plaintiff must pursue the individual members whom he can show were liable for the injury, leaving the powerful organization to go free. We do not think it can be said that the defendants United Mine Workers of America and the local unions are not associations existing under or authorized by law within the meaning of section 8, above quoted. But, if defendants are associations within the meaning of the law, it is next insisted that an unincorporated association cannot be sued in the name of the association. It is true that, in the absence of a specific statute to the contrary, the rule at common law, and under the Codes, is that an unincorporated association is not recognized as having a legal existence apart from its members. The action lies against the members individually, but not against the unincorporated association in its col-

lective capacity and name. In many of the states statutes have been passed changing this rule, so that unincorporated associations not having corporate powers may be sued in the name of the association. It has also been ruled that the common-law rule, that only entities known to the law are capable of being sued, may not only be modified by express enactment, but also by statutory implication. Taff Vale R. Co. v. Amalgamated R. Servants' Society, 85 L. T. Rep. (N. S.) 147.

If we are correct in our view that voluntary unincorporated associations are included in the word "associations" as used in section 8, above quoted, then we are of the opinion that there is a clear and necessary implication that the association may be sued in its own name; otherwise the provision in the law that the association should be liable could not be enforced, and the law would fail as against all such associations, the remedy of the injured party being confined to an action against the mere agents and employés of the association, in most cases unable to respond in damages. The question as to the liability of an unincorporated labor organization to be sued under the act of July 2, 1890, in the name of the association, does not seem to have been discussed in any reported case which we have been able to find. The fact that labor organizations were before Congress seeking to be exempted from the act is of course conclusive evidence that Congress knew of such organizations, and did not intend to exempt them, while by Clayton Act Oct. 15, 1914, § 4, a remedy is given to one injured in his business or property by reason of anything forbidden in the anti-trust laws, regardless of who shall commit the injury.

The case of Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815, and Lawlor v. Loewe, 235 U. S. 522, 35 Sup. Ct. 170, 59 L. Ed. 341, known as the Danbury Hatters' Case, was twice before the United States Supreme Court. In this case the defendants were members of the United Hatters of North America and also of the American Federation of Labor. The Association by name was not a party defendant, but a large verdict in damages was recovered, and the recovery sustained on appeal. The case of Eastern States Retail Lumber Dealers' Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788, was a case brought by the United States for a violation of the act of July 2, 1890, against various lumber associations composed largely of retail lumber dealers in New York, New Jersey, Pennsylvania, Connecticut, Massachusetts, Rhode Island, Maryland, and the District of Columbia, and the officers and directors of the associations. No objection to suing the defendants in the name of the association was made in this case. The case of the United States v. Workingmen's Amalgamated Council (C. C.) 54 Fed. 994, 26 L. R. A. 158, was cited with approval by the Supreme Court of the United States in Loewe v. Lawlor, 208 U. S. 301, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815. No objection was made that this suit was against the association by name. The result of what has been said is that the United Mine Workers of America and the local unions were properly sued in the name of the association. Whether they are in fact liable in this action is another question, not now to be considered.

[3] We now come to the question as to whether the complaint states a cause of action. The complaint is necessarily voluminous as it describes an alleged conspiracy. A copy appears in the margin.[1] It will not be necessary or convenient to restate in this opinion the allegations of the complaint, as they are fully stated in the copy set out in the margin. A careful consideration of the same has led to the conclusion that it sufficiently alleges a combination and conspiracy in restraint of interstate trade and commerce between the defendants, that the acts alleged to have been committed by them in pursuance of said combination and conspiracy resulted in damage to some or all of the coal companies, and that when these acts were committed the operating coal companies were engaged in interstate trade and commerce in the mining and shipment of coal. It is objected that the complaint fails to show that the plaintiffs were engaged in interstate trade or commerce at the time of the commission of the alleged wrongs, or that the plaintiffs have suffered damages to interstate trade or commerce by reason of defendant's acts. The complaint alleges that at the time the receiver was appointed and for many years prior thereto certain of the coal companies were engaged in the production, loading, and shipment of coal for interstate trade and commerce from coal lands located in Sebastian county, Ark. It is claimed that, as the complaint does not allege the date when the receiver was appointed, it is impossible to determine when the coal companies were engaged in interstate commerce in relation to the mining and shipment of coal. This contention is without merit.

It is not claimed that the causes of action have been barred by the statute of limitations, and the complaint fully shows that 75 per cent. of all coal mined and shipped was shipped to customers outside of the state of Arkansas. It is alleged in the complaint that by reason of the combination and conspiracy pleaded, and the acts done in pursuance thereof, such companies have suffered great loss and injury to their business and property, in the sum of $427,820.77. This allegation is followed by an itemized statement of the character and amount of damage. Whether they have been damaged as alleged only a trial can determine. Certainly on general demurrer the complaint must be held to allege some damage.

[4] Some of the coal companies were not actually engaged in interstate commerce at the time the alleged acts were committed by the defendants; but they were preparing to do so, and were prevented from so doing, as they allege, by the wrongs of the defendants. It was held in Pennsylvania Sugar Refining Co. v. American Sugar Refining Co. et al., by the Circuit Court of Appeals of the Second Circuit, 166 Fed. 254, 92 C. C. A. 318, that:

"A conspiracy to prevent a manufacturer who procures his supplies and disposes of his products by means of interstate commerce from engaging in business at all necessarily places restraints upon such commerce. Its flow is restricted and interrupted. The importation and exportation of articles of commerce are directly prevented, and none the less so because the conspiracy may be of so wide a scope as to interfere with interstate commerce also."

---

[1] See note at end of case.

To the same effect is Thomsen et al. v. Union Castle Mail Steamship Co. et al., 166 Fed. 251, 92 C. C. A. 315 (2d Circuit).

[5] It is next objected that the alleged wrongs of the defendants do not constitute an interference with interstate trade or commerce. We do not think, since the case of Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815, and Lawlor v. Loewe, 235 U. S. 522, 35 Sup. Ct. 170, 59 L. Ed. 341, it can be said that this can be considered an open question. In rendering the opinion of the Supreme Court when the case was last before it, Justice Holmes said:

"The substance of the charge is that the plaintiffs were hat manufacturers who employed non-union labor; that the defendants were members of the United Hatters of North America and also of the American Federation of Labor; that, in pursuance of a general scheme to unionize the labor employed by the manufacturers of fur hats (a purpose previously made effective against all but a few manufacturers), the defendants and other members of the United Hatters caused the American Federation of Labor to declare a boycott against the plaintiffs, and against all hats sold by the plaintiffs to dealers in other states and against dealers who should deal in them; and that they carried out their plan with such success that they have restrained or destroyed the plaintiff's commerce with other states."

This charge being proven, the learned justice further said (235 U. S. 534, 35 Sup. Ct. 172, 59 L. Ed. 341):

"We agree with the Circuit Court of Appeals that a combination and conspiracy forbidden by the statute were proved, and that the question is narrowed to the responsibility of the defendants for what was done by the sanction and procurement of the societies above named."

The Sherman Act has been so frequently and recently construed by the Supreme Court as to require no extended discussion now. Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663; United States v. St. Louis Terminal, 224 U. S. 383, 32 Sup. Ct. 507, 56 L. Ed. 810; Standard Sanitary Manufacturing Co. v. United States, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. 107; United States v. Union Pacific R. R. Co., 226 U. S. 61, 33 Sup. Ct. 53, 57 L. Ed. 124; United States v. Reading Co., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243; United States v. Patten, 226 U. S. 525, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325; Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232; Straus v. American Publishers' Association, 231 U. S. 222, 34 Sup. Ct. 84, 58 L. Ed. 192, L. R. A. 1915A, 1099, Ann. Cas. 1915A, 369; Eastern States Lumber Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788. As was said in the case last cited:

"It broadly condemns all combinations and conspiracies which restrain the free and natural flow of trade in the channels of interstate commerce."

It is next contended that, if plaintiffs have suffered damage to their interstate commerce or trade, such damage is indirect, incidental, and too remote to entitle them to recover in this action. As against a general demurrer the complaint, as we have stated, is good so far

as the question of damages is concerned. The law provides that any person who shall be injured in his business or property rights by reason of anything forbidden or declared unlawful by the act shall recover threefold the damages by him sustained. It is the source of the injury, and not the character of the property injured, which constitutes the test of recovery. Assuming that an unlawful conspiracy or combination in restraint of interstate commerce exists, then, if any person is injured by it in his business or property rights, he may recover. Chattanooga Foundry & Pipe Works v. City of Atlanta, 203 U. S. 390, 27 Sup. Ct. 65, 51 L. Ed. 241. The complaint alleges actual interference with and destruction of cars of common carriers to be used in interstate commerce for the transportation of coal. This fact alone would show an interference with interstate commerce. Steers v. United States, 192 Fed. 1, 112 C. C. A. 423; United States v. Reading Co., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243.

In Swift v. United States, 196 U. S. 375, 25 Sup. Ct. 276, 49 L. Ed. 518, it was said:

"Although the combination alleged embraces restraint and monopoly of trade within a single state, its effect upon commerce among the states is not accidental, secondary, remote, or merely probable. On the allegations of the bill the latter commerce no less, perhaps even more, than commerce within a single state, is an object of attack. * * * Moreover, it is a direct object. It is that for the sake of which the several specific acts and courses of conduct are done and adopted."

In United States v. Reading Co., 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243, it was said:

"The mere fact that the sales and deliveries took place in Pennsylvania is not controlling when, as here, the expectation was that the coal would, for the most part, fall into and become a part of the well-known current of commerce between the mines and the general consuming markets of other states. * * * The purchase and delivery within the state was but one step in a plan and purpose to control and dominate trade and commerce in other states for an illegal purpose."

After considering the complaint and the decisions of the Supreme Court and other courts, we can come to no other conclusion than that the case made by the complaint falls within that class of restraints of trade aimed at compelling third parties and strangers involuntarily not to engage in the course of interstate trade, except on conditions that the combination imposes, and therefore violates the act of July 2, 1890.

In United States v. Patten, 226 U. S. 525, 33 Sup. Ct. 141, 57 L. Ed. 333, 44 L. R. A. (N. S.) 325, it was said:

"Section 1 of the act, upon which the counts are founded, is not confined to voluntary restraints, as where persons engaged in interstate trade or commerce agree to suppress competition among themselves, but includes as well involuntary restraints, as where persons not so engaged conspire to compel action by others, or to create artificial conditions, which necessarily impede or burden the due course of such trade or commerce and restrict the common liberty to engage therein."

Judgment below reversed, and the case remanded, with instructions to overrule the demurrer, and allow defendants to answer the complaint, if they shall be so advised.

### NOTE.

"3. That the Hartford Coal Company, the Mammoth Vein Coal Company, the Mammoth Vein Coal Mining Company, the Coronado Coal Company and the Prairie Creek Coal Mining Company, and each and every one of them, were at the time of the appointment of said receiver and for many years prior thereto operating coal companies engaged in the production, loading, and shipment of coal for interstate trade and commerce, and the coal lands of each of said companies from which said coal was mined and shipped were located in Sebastian county in the state of Arkansas."

"4. That prior to the year 1914 and before the commencement of the difficulties hereinafter set forth, the Hartford Coal Company employed about seventy men, the Mammoth Vein Coal Company employed about three hundred men, the Coronado Coal Company employed about two hundred and fifty men, and the Prairie Creek Coal Mining Company employed about two hundred and fifty men, and that all of said operatives were employed by said respective companies in connection with the production, loading, and shipment of coal in or about their respective mines for interstate trade and commerce, and that the value of the annual shipments and sale of coal by said mines respectively exceeded the following:

Hartford Coal Company...............................$ 50,000
Mammoth Vein Coal Company.......................... 120,000
Coronado Coal Company.............................. 175,000
Prairie Creek Coal Mining Co....................... 120,000

"That seventy-five per cent. of the coal shipped by each of said mines was sold and shipped to customers outside of the state of Arkansas in the ordinary course of interstate trade and commerce.

"That prior to April in the year 1914 the Mammoth Vein Coal Mining Company entered into a written contract with the Mammoth Vein Coal Company and the Prairie Creek Coal Mining Company wherein and whereby it agreed to operate and produce coal from mines of the said Mammoth Vein Coal Company and the Prairie Creek Coal Mining Company for and in behalf of said companies, said Mammoth Vein Coal Company and said Prairie Creek Coal Mining Company continuing to sell and ship the coal so produced from their said respective mines as theretofore, 'the Prairie Creek Coal Mining Company selling and shipping the coal mined by said Mammoth Vein Coal Mining Company from the mines formerly operated by the Prairie Creek Coal Mining Company, and the Mammoth Vein Coal Company continuing to sell and ship the coal produced by the Mammoth Vein Coal Mining Company from the mines formerly operated by said Mammoth Vein Coal Company, and that 75 per cent. of the output of each of said mines was so produced, loaded, and shipped for customers outside of the state of Arkansas in the course of interstate trade and commerce.

"That the Denman Coal Company, the Bache-Denman Coal Company, the Sebastian County Coal Company, the Mammoth Vein Coal Company, and the Mammoth Vein Royalty Company, and each and every one of them, were financially interested in one or more of the aforesaid operating companies, either through contracts or the lease of coal lands on which said operating coal companies were working or through the ownership of all or the majority of the stock of said operating companies.

"5. That the mining of coal, as conducted by said operating companies, is not a manufacturing business, but includes only the taking of the coal in its natural condition from the earth and loading it on the cars of common carriers for transportation by them over their lines to the respective consignees, and that about 75 per cent. of the shipments of said operating companies were made by common carriers on interstate trains to points outside of the state of Arkansas, including the states of Oklahoma, Kansas, Nebraska, Texas, and Missouri; that among the employés, which each of said companies required for the conduct of said interstate trade and business, were those who placed

the cars of interstate carriers in convenient places on the side tracks of said carriers for loading for interstate shipment, those who loaded said cars of common carriers on said tracks with coal for shipment to points outside of the state, and those who placed said cars so loaded for points outside of the state in their proper place on the tracks of said carriers where they could be hauled by the engines of said carrier over the tracks of said carriers and attached to interstate freight trains for transportation to points outside of the state, and that the work of shipping coal, when hereinafter mentioned, includes said loading and placing of said cars on the tracks of said carriers; that the ownership and operation of said mines, and the taking and producing of coal therefrom, was but one step in the said interstate trade and business of said companies, and that said companies were dependent for the profitable conduct of their business upon the trade which it secured from customers outside of the state of Arkansas, and owned and operated said mines in said state of Arkansas for the purpose of carrying on said interstate trade and business, and would not have purchased or attempted to operate said mines, except for the purpose of carrying on said interstate trade and business, and one of the principal assets of said companies was their good will, trade, and business with customers outside of the state of Arkansas, and said companies employed agents and salesmen in other states in order to protect, preserve, build up, and increase said interstate trade, business, and good will."

"11. That said United Mine Workers of America and the combination of the defendants hereinafter described divides all coal mines in the several states of the United States into two classes, one class being called 'union' or organized mines, because they are operated under an agreement with the United Mine Workers of America, or one of its district branches, to employ none but members of that union in or about the work of producing, loading, and shipping coal and to comply with all the rules and regulations of the United Mine Workers of America and its district branch having jurisdiction over the respective mines in accordance with their geographical location; the second group of said mines as so designated and classified by the defendants are known as non-union, unorganized, or 'open shop' mines, because they refuse to make such agreement with the defendants' combination to employ only members of the United Mine Workers of America exclusively, although many of them do not discriminate against or refuse to employ any person on the ground that he is a member of said union. That the coal produced by said union mines is hereinafter described or designated as union coal, and the coal produced by the unorganized, non-union or 'open shop' mines is at times hereinafter designated as non-union coal.

"12. That owing to the restrictions and unreasonable regulations which the United Mine Workers of America imposes on all union or organized mines, said mines are conducted wastefully and inefficiently, and the cost of production and the selling price of union coal is thereby unreasonably and unnecessarily enhanced, and cannot successfully compete with the products of non-union mines throughout the course of interstate trade and commerce, and it is because of this fact, and to protect said union mines against said non-union competition in coal of the lower selling price, that the United Mine Workers of America and those acting in conjunction with them have divided all mines in the United States into two classes, to be designated respectively as union mines or non-union mines, in order that they may more readily and effectively prevent and restrain all interstate trade and competition in the products of non-union mines.

"13. That, except for the anthracite coal mines in the state of Pennsylvania, practically the entire business of mining and shipping coal in the United States is done by what is known as bituminous mines located in the states of Washington, Wyoming, Utah, and Montana in the Northwest, Illinois, Ohio, Indiana, and Michigan in the northern Middle States; Iowa, Colorado, New Mexico, Kansas, Missouri, Oklahoma, Arkansas, Texas, Kentucky, Tennessee, and Alabama in the Middle and Southern States, and Pennsylvania, Virginia, West Virginia, and Maryland in Eastern States; that each and every one of the bituminous mines in the several states above mentioned is engaged in or subject and liable to competition in the course of interstate trade, from the

mines in one or more of the other states above named, and nearly every one of said mines is subject to competition of the mines of each and every one of the several states above named in reaching or attempting to reach different markets of the United States in various industrial centers in different states through the course of interstate trade made possible by transportation of common 'carriers from one state to another.

"14. That the mines for which the plaintiff is acting as receiver, when in operation, compete directly with the mines of Illinois, Kentucky, Alabama, New Mexico, Colorado, Kansas, Oklahoma, and the other mines of Arkansas for the markets of Louisiana, Texas, Oklahoma, Nebraska, Kansas, Missouri, Iowa, and Minnesota, and are subject to the competition of said mines in endeavoring to reach the various markets of other states through the channels of interstate trade and commerce. That the mines of Illinois sell coal through the course of interstate trade and commerce to markets in Louisiana, Texas, Missouri, Nebraska, Kansas, and other states, and the operating companies for which plaintiff, Dowd, is acting as receiver, sold coal through the course of interstate trade and commerce to purchasers in said markets and states, and thereby entered into interstate competition with said mines of Illinois in said states, and others, and are subject to and affected by the interstate competition of said mines and others in many other states. That, except for the unlawful interference of the defendants hereinafter set forth, each of said mines would have engaged in interstate competition with the said mines of other states as aforesaid in the year 1914.

"15. That all of said coal mines of Illinois, Ohio, Indiana, Wyoming, Michigan, Missouri, Iowa, Texas, Arkansas, and Oklahoma are union, and part of the bituminous mines of Pennsylvania, Kentucky, and West Virginia are union, and that said mines of Colorado, New Mexico, Alabama, Virginia, and Tennessee are non-union or unorganized; that the annual output of bituminous coal in the United States is a little less than 500,000,000 tons, of which the state of Pennsylvania produces over one-third, the states of Ohio, Illinois, and Indiana produce over one-fifth, and the state of West Virginia produces about one-seventh; that at least 60 per cent. of the entire production of bituminous coal in the aforesaid states of the United States is produced by the so-called union or organized mines; that if the attempts of the United Mine Workers and those working in conjunction with them in the unlawful conspiracy hereinafter set forth are successful in carrying out their conspiracy to unionize all the bituminous coal mines of Pennsylvania, West Virginia, Virginia, and Colorado as hereinafter set forth, then about 90 per cent. of the bituminous coal produced in the United States which enters into Interstate trade and commerce will be coal produced by the so-called union mines, and if the United Mine Workers of America were successful in all the attacks which it has made in different districts upon non-union mines in furtherance of said unlawful conspiracy, the said combination would have substantially a complete monopoly of interstate trade and commerce in coal in the United States and the amount of non-union coal which entered into interstate commerce would be negligible.

"16. That the United Mine Workers of America, the defendants, and many other persons to the plaintiffs unknown, now are, and for many years past have been, engaged in an unlawful combination and conspiracy, as hereinafter more fully set forth, in unlawful restraint of trade and commerce in coal among the different states of the United States, and through means whereof are unlawfully attempted to monopolize and are monopolizing said trade and commerce; that in furtherance of said unlawful combination and conspiracy, the defendants, the United Mine Workers of America and those confederated together with them in said unlawful scheme, have combined and conspired together to exclude and drive out of interstate trade and commerce, and to restrain and prevent all interstate trade and commerce in, any and all coal produced, loaded, and shipped by so-called non-union and unorganized mines, by hampering, preventing, and interfering with the production, loading, and shipment of coal for interstate commerce in any of the coal-mining states by any so-called unorganized or non-union mines, so that it cannot become a subject or commodity of interstate trade and commerce, and cannot enter into interstate competition with the products of so-called union or organized

mines located in divers states, and to further carry out said conspiracy by hampering and interfering with the production, loading, and shipment for interstate trade and commerce by said non-union or unorganized mines in any and all the several states where said mines are or may be located, with the purpose and intent of increasing the cost of production, loading, and shipment of said commodities so destined for interstate trade and commerce, and the resulting selling price thereof in the markets of the different states reached by said interstate shipments, so that said commodities cannot successfully compete in said markets with the coal produced, loaded, and shipped by the so-called union or organized mines working under agreement with said unlawful combination in the several states where located.

"17. That one of the objects of said unlawful combination and conspiracy in restraint of interstate trade is to monopolize the trade or occupation of mining coal for the members of the United Mine Workers of America and prevent the employment of non-union men in any part of the United States at the trade or craft of mining coal, and prevent the products of the labor of non-union mines from becoming subjects or commodities of interstate trade and commerce, in order thereby to more effectually compel them to abandon the trade or vocation of coal mining or become members of the said United Mine Workers of America, and thereby to secure complete monopoly and unification in control and management, so far as labor is concerned, of all competing mines in all parts of the United States as has already been achieved by said combination in many states as aforesaid.

"18. That the scope and object of said illegal scheme is to suppress and destroy the business of all non-union and unorganized mines whose products enter into interstate trade and by various means to prevent any mining company from engaging in the business of selling coal for interstate trade as an unorganized mine and prevent any of the so-called union or organized mines from commencing operations as a non-union or unorganized mine, and thus by such suppression, obstruction, and destruction of the business of any of the independent and competing mines in the several states which are operating or may hereafter operate on a non-union or unorganized basis, to completely monopolize interstate trade and commerce for union coal produced under the domination of the United Mine Workers of America, and maintain the price of said union coal in interstate commerce by protecting it from interstate competition of coal which but for said combination would be mined by the more efficient non-union mines.

"19. That the object and purpose of said combination in extending its domination and control over separate and competing mines in different states, which in the absence of said unlawful combination would be engaged in interstate competition with each other, and the sole object and purpose of said combination in destroying or preventing interstate shipments of coal by all mines in any of the coal-mining states, which do not acquiesce in its control and domination, is to prevent any coal not produced by union mines from becoming a subject of interstate commerce and entering into interstate competition with the products of so-called union mines and to further carry out agreements and understandings hereinafter described, between the proprietors of the so-called union mines and said unlawful combination to the effect that the defendants and others acting in conjunction with them in said unlawful conspiracy will protect interstate trade and business of said union mines from the competition of unorganized mines by employing all the means available to organized labor to prevent the production, loading, and shipment of coal for interstate trade and commerce by unorganized mines.

"20. That in furtherance of said unlawful combination and conspiracy to unduly restrain interstate trade and commerce, and to exclude the products of all unorganized mines and non-union miners from interstate trade and commerce, the United Mine Workers of America working through their district organizations, and the defendants, have ordered and coerced strikes of employes employed by unorganized mines in different states and by violence, intimidation, mobs, and riots prevented the employment of any miners in said mines for production, loading, or shipment of coal for interstate commerce, and by dynamite and arson and other unlawful means have destroyed the facilities of said unorganized mines for producing, loading, and shipping coal for

interstate commerce, and by divers other means have hampered, interfered with, prevented, and attempted to unduly enhance the cost of producing, loading, and shipping of coal by said unorganized mines for interstate commerce, so that it would no longer be marketable as an article or commodity of interstate trade and commerce in competition with union coal.

"That each and every one of the acts hereinafter set forth, wherein and whereby the production, loading, and shipment of coal by the plaintiffs, or any other unorganized mines, was destroyed, interrupted, hampered, or interfered with, were done and carried out in furtherance of the aforesaid combination and conspiracy to unduly and directly restrain interstate trade and commerce, and with the intent, purpose, and effect thereof as hereinabove set forth, and with the purpose or effect of inducing and forcing persons and corporations formerly engaged in interstate trade as non-union mines to refrain therefrom until such times as they would carry on said business as union mines upon terms dictated by said combination and conspiracy.

"21. That in furtherance of the combination and conspiracy to restrain interstate trade and commerce in bituminous coal and to prevent any non-union coal from entering into interstate trade and commerce, the United Mine Workers of America and its district branches have from time to time since 1898 entered into negotiations, understandings, and agreements with the operators of union mines in the states of Ohio, Illinois, and Indiana and other states, wherein and whereby it was understood and agreed that in consideration of said operators agreeing to or continuing to operate union mines, the said United Mine Workers of America, the defendants and those working in conjunction with them in said unlawful scheme and purpose, would by strikes and the usual unlawful means which invariably accompany all strikes conducted by the United Mine Workers or any of its branches, prevent the production and shipment of bituminous coal by all so-called non-union and unorganized mines in other states whose products come into interstate competition with the products of said union mines through the course of interstate trade and commerce, and that said agreement and understanding required said United Mine Workers and its said branches to use all means in its power to interfere with and prevent interstate commerce in bituminous coal by all unorganized mines, and by all competitive mines which should thereafter become non-union or unorganized, and that the combination and conspiracy herein described to interfere with and destroy the business of the mines for which plaintiff, Dowd, is acting as receiver, and all acts in furtherance thereof hereinafter described were done in pursuance of said illegal arrangement, contracts, and understandings between the said United Mine Workers and said union operators to destroy and prevent interstate trade and commerce in bituminous coal from unorganized fields by destroying or interfering with the facilities of said unorganized mines for the production and shipment thereof.

"22. That in furtherance of said illegal combination and conspiracy to restrain and prevent interstate trade and commerce in bituminous coal, and drive all non-union coal out of interstate trade and commerce, the said United Mine Workers of America and those working in conjunction with them did at various times since 1898 embark and engage upon a general campaign and crusade to prevent all the non-union bituminous mines in the state of Pennsylvania, which were producing about 12 per cent. of the entire output of bituminous coal in the United States, from engaging in interstate trade and commerce in non-union coal, by ordering a strike of employés in said mines, and through violence, intimidation, and threats preventing the employment of any operatives for the production, loading, and shipment of coal, and by the use of fire and explosives destroying the facilities of said mines for the production, loading, and shipment of said coal.

"And that in or about the year 1911 said United Mine Workers and those acting in conjunction with them did undertake to and did employ said means in furtherance of said unlawful design against certain non-union mines in Westmoreland and Irwin districts in the state of Pennsylvania, known as the Westmoreland and Irwin mines, in order to prevent said mines from engaging in interstate trade and commerce in non-union coal.

"That in furtherance of said illegal combination and conspiracy to restrain

trade among the several states in coal, as hereinabove set forth, said United Mine Workers and those acting in conjunction with them did in the year 1913 enter into a general campaign and crusade against non-union mines in the state of Colorado, and agreed to and did order a strike of said employés of said various competing miners of said state, and by violence, threats, and intimidation did prevent said mines from procuring further employés to produce, load, or mine coal for the interstate trade and commerce of said mines, and did by the use of fire and explosives destroy the facilities of said mines for the production, loading, and shipment of coal for interstate trade and commerce, in order thereby to destroy interstate trade and commerce in non-union coal.

"That at various times since 1906, and in furtherance of said unlawful scheme to restrain trade in bituminous coal among the several states, said United Mine Workers and those acting in conjunction with them did engage in a general campaign and crusade to destroy interstate trade and business of the non-union bituminous mines in West Virginia by ordering strikes of the employés of said companies engaged in the work of producing, loading, and shipment of coal for interstate trade and commerce, and by violence, threats, and explosives, and by preventing the employment of other operatives to carry on said work, and by fire and explosives destroying the facilities of said mines for the production, loading, and shipment of said coal for interstate trade and commerce; and that said United Mine Workers and those working in conjunction with them have from time to time on other occasions employed all of said means to destroy the business of all of said non-union companies in Pennsylvania, West Virginia, Colorado, and other states, in order thereby to prevent said companies from shipping non-union coal for interstate trade and commerce.

"23. That early in the year 1914 all said companies for which the plaintiff, Dowd, is acting as receiver decided that said operating companies should be conducted on a non-union or open shop basis, without discrimination against any employé on the ground that he was or was not a member of any union, and that about the middle of March, 1914, the Mammoth Vein Coal Company and the Prairie Creek Coal Mining Company closed down their said mines and discontinued operation as union mines, preparatory to reopening upon the non-union or open shop basis in the month of April, 1914; that the Hartford Coal Company had not been in operation for over a year previous thereto, but it was the plan and intention of said company to also reopen upon the non-union or open shop basis as soon as it became expedient so to do, or at least in the summer of 1914; that the Coronado Coal Company continued operation as a union company until April 18, 1914, when its employés were ordered out on a strike by the defendants in furtherance of the unlawful conspiracy herein set forth, because some of the individuals interested in said mines that were going to be operated as open shops had also financial interests in said Coronado Coal Company and might use their profits from said company to carry on interstate commerce in non-union coal from said other mines; that before said strike took place, and early in the year 1914, as aforesaid, it was the intention of the said Coronado Coal Company and the persons and corporations financially interested in it that said company should be placed upon the non-union or open shop basis of operation as soon as expedient, or at least by the summer of 1914; that said plan of operation for said mines was in part to be carried out by having the Mammoth Vein Coal Mining Company operate the mines of the Mammoth Vein Coal Company and the Prairie Creek Coal Mining Company under its written contract described in paragraph marked '4' herein.

"24. That in the year 1914 each of said operating companies for which the plaintiff, Dowd, is acting as receiver had made preparations to do a large and profitable business with dealers in coal in other states, and to renew, manage, and conduct said interstate trade and commerce upon a non-union and 'open shop' basis, and the condition of the market outside of the state of Arkansas in which said companies would sell their said coal, and the condition of the business of said companies, was such as to warrant the full belief that the ensuing season would be a profitable one to said companies, and that in the year 1914, when the defendants undertook to destroy the business of said

operating companies, for which the plaintiff, Dowd, is now acting as receiver, some of said operating companies had actually commenced, and were engaged in carrying on, said interstate trade and business, and enjoying said interstate good will, and were shipping non-union coal to customers in other states in the course of interstate trade and commerce, and the rest of said operating companies were prepared to commence and renew their interstate trade and business, and were intending to renew said interstate trade and business, on a non-union basis.

"25. That at all times after April 1, 1914, the defendants and those acting in conjunction with them, in furtherance of the unlawful conspiracy hereinafter set forth, well knew of said intention, plans, and costly preparations of said companies, persons, and corporations in control thereof to operate each and every one of said mines in the future upon the open shop or non-union basis, and to sell and ship non-union coal in interstate commerce in competition with union mines, as soon as possible, and that all of the acts hereinafter described, which were done by the defendants and those acting in conjunction with them to injure and destroy the business and property of said companies, were done in furtherance of said unlawful scheme and conspiracy to prevent interstate trade and commerce in bituminous coal produced, loaded, or shipped by so-called non-union or open shop mines.

"26. That in April, 1914, and at various times thereafter, in furtherance of said plans to have all said companies engaged in interstate trade as non-union mines, some of said operating companies for which plaintiff, Dowd, is acting as receiver began to operate their said mines on an open shop basis, or as non-union or unorganized mines, and from time to time in the year 1914 employed large numbers of men engaged respectively in the work of mining, loading, and shipping coal for interstate trade and commerce, preparatory to employing additional miners and opening additional mines for the purpose of carrying on an interstate trade and commerce on a still larger scale, and preparatory to having all of said operating companies do likewise. That none of the said miners so employed belonged to, or had any connection or association with, the United Mine Workers of America, or any of its district branches, or any of the defendants, but that the defendants, the United Mine Workers of America and those acting in conjunction with them, in furtherance of their combination and conspiracy to drive non-union coal out of interstate trade and commerce, and to restrain and prevent interstate trade and commerce therein, and in furtherance of their understanding with the proprietors of union mines competing with said mines, combined and conspired together, in furtherance of said conspiracy, to ruin and destroy the interstate trade and commerce of said mines, and to prevent them from commencing or engaging or continuing therein, by interfering with and preventing the production, loading, and shipment of coal for interstate commerce by said mines, and in furtherance of said combination and conspiracy they agreed upon and did the following acts: By threats, intimidation, violence, and unlawful assemblies, they drove and frightened away all of the men employed by said mines at the work of mining, loading, and shipping coal for interstate trade and commerce, including those men employed at the work of placing cars of interstate carriers at the proper place on the tracks of said carriers where they could be loaded with coal for shipment outside of the state, and including those men employed in loading said cars of the common carriers, and those who placed the cars after loading upon the proper part of the tracks of the common carrier where they could be taken up by the interstate trains of said carriers for transportation to points outside of the state, and by threats, violence, murder, mobs, and riots, prevented the said companies from employing or obtaining for employment any other operatives to load said cars of interstate carriers, and to manipulate and place said cars before and after loading for interstate transportation in their proper place on the tracks of the carrier, and by the same unlawful methods prevented said companies from employing or obtaining for employment any miners whatsoever to perform any of the work of mining, loading, and shipping coal for said mines, and by the use of fire, dynamite, and other explosives they did destroy the structures and other valuable facilities of said mines for the production, loading, and shipment of coal for interstate trade and

commerce, and did destroy the cars of interstate carriers, which were station-ed at or about the mines waiting to be loaded with interstate shipments, and destroyed cars of said carriers and shipments already loaded thereon to be hauled away by interstate carriers for transportation to consignees outside of the state of Arkansas, and destroyed the business of other concerns in which the same persons were interested, in order to impoverish said persons and prevent their carrying on said non-union coal-mining business. That by said unlawful means said defendants and those acting in conjunction with them prevented any of said companies from engaging or continuing to engage in interstate trade and commerce; and the defendants well knew and intended that the destruction of the coal mines of said operating companies located in Sebastian county, Arkansas, and their interference with the operations there-of, would result in the destruction of the interstate trade and commerce of said companies, and the defendants destroyed said mines for the express pur-pose of entirely destroying and ruining said interstate trade and business. That none of the defendants or any one acting in conjunction with them had any interest or object in destroying said property and interfering with the operation of said mines as aforesaid, except in so far as said destruction and interference prevented the sale and shipment of coal by the said companies in competition with union mines in which said combination was interested, and their primary and direct object in so doing was to destroy the interstate trade and commerce of said companies, because it constituted 75 per cent. of the trade and commerce conducted by them, and that the destruction of the working organization and production facilities of the said companies was but a step in a scheme and purpose to destroy interstate trade and commerce in non-union coal, and prevent it from coming into competition with union coal in the course of interstate trade and commerce.

"27. That except for the unlawful combination and conspiracy of the de-fendants, and the acts done in furtherance thereof as aforesaid, the said Hart-ford Coal Company, the Mammoth Vein Coal Company, the Coronado Coal Company, the Prairie Creek Coal Mining Company, and the Mammoth Vein Coal Mining Company would have, long prior to the commencement of this action and in a short time, secured employés to man their mines and engage in the work of producing, loading, and shipping coal for interstate trade and commerce, and would as non-union and unorganized mines have successfully shipped coal to the amount of over $600,000 annually in the aggregate, and would have been able to realize a large profit thereon.

"28. That by reason of said combination and conspiracy of the defendants in restraint of interstate trade and commerce, and the acts done in furtherance thereof to injure and destroy the business of the said companies for which the plaintiff, Dowd, is acting as receiver, the said companies have suffered great loss and injury to their said business and property, in the total sum of $427,820.77, and that said damages are more fully itemized as follows. * * *"