**HERKET & MEISEL TRUNK CO. et al. v. UNITED LEATHERWORKERS' INTERNATIONAL UNION, LOCAL LODGE OR UNION, NO. 66.**

(District Court, E. D. Missouri, E. D.   November 26, 1920.)

No. 5353.

1. **Commerce** ☞16—**Monopolies** ☞14—**Manufacturer of goods intended for interstate shipment is engaged in "interstate commerce," within federal anti-Trust Act.**

   Manufacturers engaged in the production of goods which they intend to ship in interstate commerce are engaged in such commerce, even before the goods are made, so that a conspiracy to interfere with the manufacture of such goods is a conspiracy in restraint of trade or commerce, under Act July 2, 1890, § 1 (Comp. St. § 8820), which may be enjoined by the District Court under section 4 of that act (section 8823), though there is no interference with any shipment of goods after they were actually manufactured.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. **Monopolies** ☞21—**Unions having control of pickets are responsible for unlawful acts.**

   Trade unions, which through their committees have control of the picketing of plants against which a strike has been declared, are responsible for the unlawful acts of the pickets of which they have knowledge, where they took no disciplinary action to control the unlawful acts, so that they can be found guilty of an unlawful conspiracy because of such acts.

3. **Monopolies** ☞24 (2)—**Conspiracy to picket unlawfully need not be proved by direct evidence.**

   In a suit for injunction against a trade union, the existence of a conspiracy to picket unlawfully need not be proved by direct evidence; but it may be shown by circumstantial evidence.

In Equity.  Suit for injunction by the Herket & Meisel Trunk Company and others against the United Leatherworkers' International Union, Local Lodge or Union, No. 66.  On final hearing on the merits. Permanent injunction granted.

Mat. J. Holland, of St. Louis, Mo., for plaintiffs.

John P. Leahy and Lena Frank, both of St. Louis, Mo., for defendant.

FARIS, District Judge.  Plaintiffs, and each of them, are engaged in the manufacture of trunks, valises, handbags, and similar articles, which they sell on orders in the state of Missouri, and in divers other states of the Union.  Some of the plaintiffs sell in foreign countries a part of their output.  By far the larger proportion of plaintiffs' business consists in sales, on orders for their products, in other states than the state of Missouri.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Prior to, and at the time of, the issuance of the temporary restraining order herein, each of the plaintiffs had on file many unfilled orders from states other than the state of Missouri, for goods, which goods, when manufactured, were to be shipped in interstate commerce. A strike was called by the defendants, which are local labor unions, or officers and members of such unions, pursuant to a vote taken by the unions and in the regular way under the rules and by-laws of the unions. This strike was called after a fruitless effort to agree upon wages and upon a contract embracing the terms and conditions of future employment, which seems to have had therein the phase of collective bargaining.

Upon the calling of the strike, which followed immediately after the failure to agree on a new contract, practically all of the employees of the plaintiffs' quit plaintiffs' employment. Thereafter, and until the temporary restraining order was issued herein, the several shops of plaintiffs were picketed by striking employees; in many cases there were from 3 to 20, or more, pickets employed around and about the shops of plaintiffs, or some of them. During this picketing many unlawful and unpeaceful acts were committed by the pickets, such as calling the various potential employees, and divers employees who continued in the employment of plaintiffs, vile and opprobrious names; there were instances of domiciliary visits, accompanied by threats, and various other things of a like nature too numerous to mention.

These unlawful acts prevented plaintiffs from employing other workmen to take the places of the strikers, so that plaintiffs were unable to manufacture the goods necessary to fill both the interstate and intrastate orders which they had on hand. Many of the goods—in fact, the larger proportion thereof—which plaintiffs would have made, but were in the mode above mentioned prevented from making, would have been shipped, when manufactured, to other states, to fill what is called in the record "interstate orders." There was no actual interference with, or hindrance of, any interstate movement, or shipment, of any goods made by plaintiffs, or by either of them, for the very simple reason that the goods designed for interstate shipment have never come into existence, on account of the interference mentioned; for, as forecast, these goods could not be manufactured, because the plaintiffs' former workmen struck and quit, and other workmen could not be obtained to manufacture them, these potential workmen being kept away by a too numerous picketing and by threats and intimidation. Such goods as were actually made by plaintiffs have been shipped in interstate commerce (when such was their destination) without let or hindrance. The methods used by defendants in preventing plaintiffs from obtaining other workmen have been, as stated, in numerous proven instances, unpeaceful and unlawful.

Barring the questions of jurisdiction, and the existence of a conspiracy, plaintiffs are unquestionably entitled to the relief by injunction for which they prayed. Indeed, counsel for defendants seemingly concede this in a tacit way, because the burden of counsel's contention is bottomed solely upon the alleged phases of jurisdiction and absence of a conspiracy. There is no diversity of citizenship involved in the

case. If this court has jurisdiction at all, it gets it solely perforce the provisions of section 1 of the so-called Sherman Anti-Trust Act (26 Stat. 209 [Comp. St. § 8820]).

[1] Upon this point it is urged that, since the goods of plaintiffs, which they intended to ship in interstate commerce when they came into existence, were not in existence at the time defendants unlawfully interfered with plaintiffs' business, the case does not fall either within the purview or protection of the Sherman Anti-Trust Act, supra, and therefore this court has no jurisdiction. Confessedly the point urged is at least, on principle, a close and difficult one. So much of the language of the Sherman Anti-Trust Act, supra, as seems pertinent to this question, reads thus:

"Every contract, combination, in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations, is hereby declared to be illegal." Section 1, Act July 2, 1890, c. 647, 26 Stat. 209.

Pursuant to the provisions of section 4 of the Sherman Anti-Trust Act (Comp. St. § 8823), supra, jurisdiction to enforce compliance with the provisions of the act by injunction is conferred upon the federal District Courts, sitting as courts of equity. When we read sections 1 and 4 together, and convert the definitions of section 1 into plain and concise language, it is simply provided that every conspiracy in restraint of interstate commerce may be enjoined in a federal court, subject, of course, in a labor dispute to the qualifications set out in the Clayton Act. It is strenuously contended by learned counsel for defendants that, when Congress referred in the Sherman Anti-Trust Act to restraints of interstate commerce, it held in mind the usual and ordinary definition of such commerce, and that the questions of when such commerce begins and when it ends are referable to the well-known definitions of this commerce, which have long been well settled in the federal courts.

Illustrating this view, and this contention, it was held in the fairly early case of In re Greene (C. C.) 52 Fed. loc. cit. 113, in an opinion rendered by Judge (afterwards Mr. Justice) Jackson, that:

"When the [interstate] commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement. of its transfer to another state. * * * Neither the production or manufacture of articles or commodities which constitute subjects of commerce, and which are intended for trade and traffic with citizens of other states, nor the preparation for their transportation from the state where produced or manufactured, prior to the commencement of the actual transfer or transmission thereof to another state, constitutes that interstate commerce which comes within the regulating power of Congress."

This definition of interstate commerce, with reference to when it begins, learned counsel for defendants urge, has been very lately affirmed and followed by the Supreme Court of the United States in the case of Hammer v. Dagenhart, 247 U. S. loc. cit. 272, 38 Sup. Ct. 529, 531 (62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724), where it was said:

"Over interstate transportation, or its incidents, the regulatory power of Congress is ample, but the production of articles, intended for interstate commerce, is a matter of local regulation. 'When the commerce begins is determined, not by the character of the commodity, nor by the intention of the owner to transfer it to another state for sale, nor by his preparation of it for transportation, but by its actual delivery to a common carrier for transportation, or the actual commencement of its transfer to another state. Mr. Justice Jackson, In re Greene, 52 Fed. 113. This principle has been recognized often in this court. Coe v. Errol, 116 U. S. 517; Bacon v. Illinois, 227 U. S. 504, and cases cited. If it were otherwise, all manufacture intended for interstate shipment would be brought under federal control, to the practical exclusion of the authority of the states—a result certainly not contemplated by the framers of the Constitution, when they vested in Congress authority to regulate commerce among the states. Kidd v. Pearson, 128 U. S. 1."

The above well-known and well-settled definition, touching when articles made in one state and intended for sale in another begin their travels towards such other state, so as to bring them within the constitutional power of Congress to regulate interstate commerce, ordinarily would be regarded as conclusive upon the courts in construing the language used in the first section of the Sherman Anti-Trust Law. If the matter were one of first impression in this circuit, I would feel constrained to agree with counsel for defendants, and to hold that the above well-settled definition touching when interstate commerce begins ought to be applied to that term, as used in the Sherman Anti-Trust Act, supra. But the matter is not one of first impression in this circuit. Therefore it is my duty, regardless of any personal views or convictions which I may hold upon the subject, to defer to and follow what I am forced to consider the view taken by the Circuit Court of Appeals of the Eighth Circuit.

In the case of Dowd v. United Mine Workers of America et al., 235 Fed. 1, 7, 148 C. C. A. 495, loc. cit. 501, it was said by the Circuit Court of Appeals of this Circuit that:

"Some of the coal companies were not actually engaged in interstate commerce at the time the alleged acts were committed by the defendants; but they were preparing to do so, and were prevented from so doing, as they allege, by the wrongs of the defendants. It was held in Pennsylvania Sugar Refining Co. v. American Sugar Refining Co. et al., by the Circuit Court of Appeals of the Second Circuit, 166 Fed. 254, 92 C. C. A. 318, that: 'A conspiracy to prevent a manufacturer, who procures his supplies and disposes of his products by means of interstate commerce, from engaging in business at all, necessarily places restraints upon such commerce. Its flow is restricted and interrupted. The importation and exportation of articles of commerce are directly prevented, and none the less so because the conspiracy may be of so wide a scope as to interfere with interstate commerce also.' To the same effect is Thomsen et al. v. Union Castle Mail Steamship Co. et al., 166 Fed. 251, 92 C. C. A. 315 (2d Circuit).

"It is next objected that the alleged wrongs of the defendants do not constitute an interference with interstate trade or commerce. We do not think, since the cases of Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815, and Lawlor v. Loewe, 235 U. S. 522, 35 Sup. Ct. 170, 59 L. Ed. 341, it can be said that this can be considered an open question. In rendering the opinion of the Supreme Court when the case was last before it, Justice Holmes said: 'The substance of the charge is that the plaintiffs were hat manufacturers who employed non-union labor; that the defendants were members of the United Hatters of North America and also of the American Federation of Labor; that, in pursuance of a general scheme to unionize the labor employed by the manufacturers of fur hats (a purpose previously made

effective against all but a few manufacturers), the defendants and other members of the United Hatters caused the American Federation of Labor to declare a boycott against the plaintiffs, and against all hats sold by the plaintiffs to dealers in other states and against dealers who should deal in them; and that they carried out their plan with such success that they have restrained or destroyed the plaintiff's commerce with other states.' This charge being proven, the learned justice further said (235 U. S. 534, 35 Sup. Ct. 172, 59 L. Ed. 341): 'We agree with the Circuit Court of Appeals that a combination and conspiracy forbidden by the statute were proved, and that the question is narrowed to the responsibility of the defendants for what was done by the sanction and procurement of the societies above named?"

Again, touching the far-reaching power of section 1 of the Sherman Anti-Trust Act, supra, it was said by the Supreme Court of the United States in Eastern States Lumber Association v. United States, 234 U. S. 600, 34 Sup. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788, that that section broadly condemns all combinations and conspiracies which restrain the free and natural flow of trade in the channels of interstate commerce. After the decision of the Circuit Court of Appeals of the Eighth Circuit, in the case of Dowd v. United Mine Workers, etc., supra, the latter case, under the style of United Mine Workers of, America v. Coronado Coal Co., was again before the Circuit Court of Appeals of this Circuit in 258 Fed. 829, 169 C. C. A. 549. The question of jurisdiction was again raised and seemingly, strenuously urged. The court refused to re-examine the question of jurisdiction, bottomed there, as here, upon the construction of the provisions of the first section of the Sherman Anti-Trust Act, but contented itself with saying upon this point:

"The learned counsel for defendants neither in their voluminous brief (326 printed pages) nor in their oral argument questioned these statements of facts, nor did they seriously attack the sufficiency of the evidence, but they insist that they do not establish that the plaintiffs were engaged in interstate commerce, and therefore these acts were not in violation of the Sherman Act. The leading case relied on is United States v. Knight, 156 U. S. 1, 15 Sup. Ct. 249, 39 L. Ed. 325, but this case, if not expressly overruled, has been much weakened by the later decisions of the Supreme Court, and it was so held by this court when this case was here before. 235 Fed. 1, 8, 148 C. C. A. 495. As this court, when this case was here before, held that the alleged wrongs and torts of the defendants charged in the complaint, and which at the trial were established by substantial evidence, constituted an interference with interstate commerce, and violated the Sherman Act, that opinion is the law of the case, and cannot be again re-examined."

. I need not go into the somewhat complicated facts before the court in the Dowd Case, supra. It will suffice to say that, if the coal companies which were the plaintiffs therein, were, upon the facts, engaged in interstate commerce, then the plaintiffs here are also, upon the facts, engaged, and were at the time of the happening of the matters and things herein complained of engaged, in interstate commerce. In the Dowd Case, the coal, or much of it, which was intended for interstate commerce, but which was prevented from flowing therein by the unlawful acts of the defendants there, had not been mined, and therefore was not in existence as a commodity of any sort of commerce for transportation; moreover, one of the plaintiffs had not engaged in business at all, but was preparing to do so, and was prevented by de-

fendants therein from so doing. So, also, here the goods for which plaintiffs had orders in interstate commerce, and which were to be manufactured for shipment therein, were not in existence. They were prevented from coming into existence by the conspiracy of defendants and by the unpeaceful and unlawful overt acts done and committed by defendants in the carrying out of the conspiracy. The broad language of the Dowd Case regarded, the additional fact in that case that a loaded car of coal was actually destroyed would seem too negligible a factor to call for a difference in the rule.

Therefore, following the rule so clearly announced in the Dowd Case and the Coronado Coal Company Case, as in duty bound, I am constrained, regardless of my own views, to hold that the plaintiffs here were engaged in interstate commerce, and that the acts of defendants operated as restraints upon that commerce within the purview of the first section of the Sherman Anti-Trust Act.

[2] I may dispose of the question of the existence of the conspiracy more briefly and with less difficulty, at least in my own mind. In order to do this logically, a brief reference may again be made to the facts. These facts substantially are that, efforts to agree with plaintiffs on a new contract of employment having failed, the local unions, who are the defendants here, immediately called a general strike against the shops of all of the plaintiffs, and thereupon practically all of the employees of plaintiffs quit work, and many of them began to picket plaintiffs' shops. This picketing was done in a way that was not lawful, and which is not legally permissible, even under the broad provisions of the Clayton Act. Defendant unions appointed committees to take charge of and manage this strike, which, of course, largely meant to manage the pickets who were engaged in picketing the shops of plaintiffs. No extra pay seems to have been given to those members of the union who did picket duty, though apparently the pickets (as were others of the striking employees) were paid strike benefits by the respective unions to which they belonged. The pickets volunteered for duty, but, as said above, they were in charge of the committees of the local unions. If these pickets committed unpeaceful and unlawful acts, therefore, absent any protest or disciplinary action by the local unions, the latter are liable for such acts. The unions cannot be heard to say that, having charge of and controlling these pickets, they are not to be held liable for the divers unlawful acts done by the pickets. If it be said that the unions in such case should have some knowledge or notice of the unlawful acts committed by pickets employed by them, and I think this ought to be conceded, the answer is that such knowledge and notice may be inferred from all the facts and circumstances shown by the evidence.

[3] Neither is it necessary to prove the conspiracy alleged in the complaint by direct evidence. Such a conspiracy may be shown by circumstantial evidence. If the rule were otherwise, it would ordinarily be impossible to establish a conspiracy in any case; a fortiori, in a labor dispute.

I conclude that the facts and circumstances disclosed a conspiracy within the meaning of the law, and that the direct and positive effect

of that conspiracy was to hurt and injure the interstate commerce of plaintiffs, as that commerce has been defined in this circuit.

It follows that the permanent injunction prayed for by plaintiffs ought to be granted. Let a decree be drawn accordingly.